[No. 52069-5-I.   Division One.   September 27, 2004.]

STEVE R. AUBIN, *Respondent*, v. LISA KAY BARTON, ET AL., *Appellants*.

*Sam B. Franklin* (of *Lee, Smart, Cook, Martin & Patterson, P.S., Inc.*) and *Stacy D. Heard* (of *Preston Gates & Ellis, L.L.P.*), for appellants.

*Robert B. Gould*, for respondent.

KENNEDY, J. — Steve R. Aubin filed a legal malpractice action against Lisa Kay Barton, an attorney who represented him in the action dissolving his marriage to Tanja Kitchel, claiming that Barton's representation at a settlement conference fell below the standard of care required of an attorney representing a grantee of stock options in a marital dissolution action in the state of Washington. Aubin contended that, but for his attorney's failure to properly advise him regarding the separate property character of the stock options, he never would have entered into a settlement agreement that treated the options as community property. A bench trial was held on the malpractice claim. At the "trial within a trial" the court found that if the marital dissolution action had gone to trial, the dissolution court would have found that the stock options were 60 percent Aubin's separate property and 40 percent community property. In the malpractice action, the court found that the attorney's performance fell below the standard of care in several respects, but for which Aubin would not have entered into the settlement agreement. The court then entered a money judgment in favor of Aubin.

Barton contends, inter alia, that the trial court erred at the "trial within a trial" by excluding expert testimony on the factual question of whether the stock options at issue were granted to Aubin primarily as a reward for past services, or whether they were, instead, granted primarily for present and future services. Barton is correct. The trial court excluded the evidence on the untenable ground that only an attorney, and not a certified public accountant (CPA), may be heard to testify at the "trial within a trial" as to factors bearing on the primary purpose of the stock option grant. The trial court expressly found that Barton had failed to meet her burden to rebut Aubin's evidence that the stock options were granted primarily to reward Aubin for past services. Because the erroneously excluded evidence went directly to this disputed issue of fact, the evidentiary error is not harmless. Although substantial evidence in the record supports the trial court's findings of fact, the verdict cannot stand because the trial court failed to hear and consider all the relevant evidence before making its findings. Accordingly, we reverse and remand.

## FACTS

In March 1992, Steve R. Aubin went to work for Apex PC Solutions, Inc. (Apex), as its sixth employee, for less than he had been earning at his previous place of employment. He was placed in charge of marketing and sales at Apex and caught up to his previous earning level within a few months. Between 1992 and 1995, Apex experienced phenomenal growth. In December 1995, Apex went through a leveraged recapitalization by which its sole shareholder transferred a significant amount of the company's equity and debt to several venture capital firms. On December 29, 1995, the board of directors of Apex adopted the 1995 employee stock plan, which provided in pertinent part:

> The purposes of this plan are to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees and Outside

Directors of the Company and its Parent and Subsidiaries, if any, and to promote the success of the Company's business.

Clerk's Papers at 981. The plan gave the board the authority to select employees to whom options would be granted. No specific criteria were defined for the selection of eligible employees.

On January 1, 1996, Steve Aubin and Tanja Kitchel moved in together in anticipation of their marriage. Shortly thereafter, on February 2, 1996, Aubin received an unvested option to purchase 11,750 shares of Apex stock at a price of $0.735 per share. Several additional key employees received option grants at the same time. Aubin and these other key employees were the first, after the company's chief executive officer, to be granted stock options. The options at issue in this case are nonqualified, nonstatutory stock options, which are treated as wages for federal income taxes when exercised and cashed in.

The resolution establishing the option grant set down a four-year vesting schedule by which 25 percent would vest on February 1, 1997, and by which the remaining 75 percent would vest in 36 equal monthly increments over the ensuing three years, the grant to become fully vested on February 1, 2000. By the terms of the grant, the employee was required to remain employed with the company in order to be qualified to exercise the options.

Aubin and Kitchel married on September 26, 1996, before any of the options had vested.

In the meantime, Apex continued to thrive. On October 14, 1996, the board amended the vesting schedule, accelerating it in anticipation of taking the company public earlier than originally planned. By the accelerated schedule, 50 percent of the stock vested on that same day, October 14, 1996, with the remainder to vest in monthly increments and to become fully vested on February 1, 1998.

Aubin and Kitchel separated on June 11, 1999, by which time all the options here at issue were fully vested. Kitchel filed a petition for dissolution of marriage in June 1999.

Aubin retained Lisa Barton, a Washington attorney, to represent him. It is undisputed that Aubin's Apex stock options were the single most valuable asset in the dissolution action. Barton does not contest that Aubin told her that the stock options had been granted to him primarily in recognition of his past services with Apex.

The parties to the marital dissolution scheduled a settlement conference for December 20, 1999, which they also describe as a mediation session, before retired King County Superior Court Commissioner Harry Slusher. Prior to the mediation session, Kitchel's attorneys obtained an analysis from Roland Nelson, a certified public accountant, regarding the characterization and valuation of the Apex stock options. Nelson concluded that all of the stock options were community property. Barton received a copy of this analysis.

Barton contacted Sam Saracino, corporate legal counsel for Apex and the individual who had drafted the stock option plan at issue. According to Saracino, Barton seemed to lack a thorough understanding of stock options, and he gave her a "tutorial." Saracino subsequently testified that Barton never asked him the purpose of the stock option grant.

Barton retained Clifford Hersman, a certified public accountant, to independently analyze and value Aubin's stock options. Along with other information she had gathered regarding the options, Barton sent Hersman a copy of *In re Marriage of Short*, 125 Wn.2d 865, 890 P.2d 12 (1995).

On December 15, 1999, prior to receiving a written analysis from Hersman, Barton sent Commissioner Slusher a letter containing various mediation materials. Asserting that the period of community property began on the date of marriage rather than the date of cohabitation because the parties had not pooled their assets and incomes during the period of cohabitation, Barton argued that the Apex stock options were Aubin's separate property. Although the letter-proper does not mention a different basis for arguing that the stock options were separate property—namely that the

purpose of the grant was to reward Aubin for past services to Apex—that argument was referenced in certain addenda to the letter. Barton enclosed a written proposal for division of community assets in which she treated all of the stock options here at issue, as well as almost all of a second group of options that were granted during the marriage, as the husband's separate property. The small portion of the second grant that Barton proposed be treated as community property was described in a footnote as follows: "From second grant of options (during marriage, for present and/or future performance)." Clerk's Papers at 1259 n.2.[1]

On December 16, 1999, Hersman faxed a letter to Barton enclosing a schedule that modified Roland Nelson's computations by changing the date for acquisition of community property from date of cohabitation to date of marriage. The letter contained the following paragraph indicating that Barton and Hersman had previously discussed the purpose for which the stock options here at issue were granted and the community and separate property implications:

> We agree that the first set of options to vest were for prior services and are mostly separate property. The entire grant amount however, is probably not separate property as these were vesting during the marriage for current services. We are unable to determine from information available to us the date of the first stock split. Once we have that amount we can more readily determine the proper separate and community property split.

Clerk's Papers at 1263.

The parties appeared with their attorneys at the mediation before Commissioner Slusher on December 20, 1999, as scheduled. After a lengthy session lasting some eight hours,

---

[1] The trial court expressly found that "[i]n all of Barton's written material during the period of representation, there is absolutely no mention or analysis by her indicating that she recognized the issue of characterization of the stock option grant as separate property for past services." Finding 37, Clerk's Papers at 1541-42. Apparently the trial court overlooked this evidence, which was referenced during the testimony of Mabry DeBuys. The weight to be given to the evidence is ultimately for the trial court, but since the finding as now written is not supported by the record, it cannot stand.

Aubin signed a CR 2A property settlement agreement that adopted Roland Nelson's analysis of the Apex stock options—thereby treating all the options as community property—and that awarded half of the community property to Kitchel.

Some 10 days later, Aubin contacted attorney Wendy Gelbart about the settlement agreement. Gelbart then contacted attorney Edward Skone to assist her with evaluating the stock options. Gelbart and Skone questioned whether Barton had recognized the issues relating to the character of the first Apex stock options. Specifically, the attorneys questioned whether Barton had recognized that stock options granted in recognition of past services, as opposed to stock options given for present or future services, could be considered an individual's separate property.

Gelbart and Skone contacted Saracino at Apex, who advised them that the first stock options had been granted primarily for past services, and provided a sworn declaration to that effect on February 7, 2000.

Aubin fired Barton, hired Gelbart and Skone, and moved to set aside the CR 2A agreement on the basis of mutual mistake regarding the character of the stock options. By the terms of the settlement agreement, this issue was arbitrated before Commissioner Slusher, who ultimately denied the motion on August 9, 2000. The marital dissolution subsequently was completed, and the property was divided in accord with the property settlement agreement.

Aubin then filed this legal malpractice claim against Barton. The parties tried the case without a jury in August 2002.

The court heard testimony from Saracino, who testified that "[t]he purpose Apex had in granting these options to [Aubin] and the five others was 100 percent for past service." Report of Proceedings (Aug. 26, 2002) at 181. Saracino testified that Apex wanted to "reward people who had been with the company through its hard times" and it chose to do so with a stock option grant. Report of Proceed-

ings (Aug. 27, 2002) at 60-61. Notwithstanding this unequivocal testimony, Saracino ultimately opined that 70 percent to 75 percent of the 1996 stock option grant was for Aubin's past services to Apex.

Aubin testified that when he started working for Apex in mid-1992, the company had no marketing approach or materials. He aggressively marketed the company's product and was able to generate about $300,000 in new business in 1992. Aubin testified that he and his marketing team generated $2.1 million in 1993, $5.7 million in 1994, and between $11 and $12 million in 1995. Aubin stated that he understood the purpose of the 1995 stock option grant was to reward a few key Apex employees for their efforts in helping make the company successful. Aubin testified that he told Barton early during her representation that the stock options were given to him because of his tenure with Apex.

Aubin asserted that after consultations with Barton, he believed that the Apex stock options granted prior to marriage would remain his separate property. Thus, he was shocked when told by the mediator that if he went to trial, the 1996 stock options likely would be split 50/50 with Kitchel. Aubin testified that he had had to argue against the split of assets during mediation without any help from Barton. Aubin stated that he signed the settlement agreement because he was worn out after a day of arguing and because Barton advised him that the division proposed by the mediator was the best he could hope for even after a trial, in that the mediator was experienced in these types of cases.

Barton admitted that she was aware that the largest single asset involved in the dissolution was the stock options. She consulted with no attorneys other than Saracino regarding the stock options. Barton testified that she did not recall discussing the purpose of the stock option grants during her phone conversations with Saracino, but that she understood their purpose from her discussions with Aubin. Barton testified that she consulted with

Hersman regarding the purpose of the grants and their division and that although the mediation materials were sent before she received Hersman's written report, she prepared her mediation materials treating the stock options as the husband's separate property based on Hersman's input.

Barton also testified that she believed the settlement agreement was fair and reasonable and that she so informed Aubin at mediation. She agreed that she had neither recommended that Aubin sign the agreement nor that he not sign it. Barton testified that she had previously tried only one contested marital dissolution action with an attorney representing the opposing party, that she had never been involved in a dissolution proceeding where stock options were involved, and that she spent only 11.54 billable hours on Aubin's case, from the beginning of her representation up to the mediation.

Gelbart and Skone testified on the elements a court considers in characterizing stock options in marital dissolutions, outlining the limited Washington case law on the subject. Gelbart and Skone also testified regarding the attorney standard of care in marital dissolutions involving stock option grants. Skone opined that it was the intent of the Apex board of directors to award Aubin stock options for his past services with the company and that no less than half of the 1996 grant was for Aubin's past services. Both Gelbart and Skone opined that Barton had not met the standard of care in her representation of Aubin in that she had failed to understand the proper characterization of the stock options, given that they were awarded for past services; she had not requested assistance from other more experienced attorneys; and she had not adequately prepared for the mediation.

Barton called attorney Mabry DeBuys to testify on the standard of care. DeBuys pointed to the documentary evidence heretofore described that indicated that Barton had in fact recognized that the 1996 stock options may have been granted to reward past services, and if so that they

were Aubin's separate property. Because Barton recognized the issue and incorporated Aubin's position that the options were his separate property into the documents that she prepared for the mediation, DeBuys opined that Barton had met the standard of care with respect to her preparation for the mediation. Pointing to language in the stock plan indicating that the purpose of the plan was to attract, retain, and provide incentive to employees to serve the company's interests, DeBuys opined that Barton did not breach the duty of care by telling Aubin that the settlement agreement was fair and reasonable, and by failing to advise him that he could do better by going to trial—because the plan language indicated that the option grant was for present and future services.

Barton offered the testimony of Steven Kessler, a certified public accountant, on the issue of whether the stock options here at issue were in fact granted primarily to reward past services, or whether they were granted primarily for present and future services. Kessler testified that he has a master's degree in tax law, that he is accredited in business valuation by the American Institute of Certified Public Accountants, that he is certified as a valuation analyst by the National Association of Certified Valuation Analysts, and that he is a diplomat of the American Board of Forensic Examiners. He also testified that he has extensive experience in working with family law attorneys in marital dissolution cases involving stock options, that he understands the factors involved in determining the community or separate character of stock options, that he understands the applicable case law involving stock options in dissolution actions and applies it in the course of performing his professional services, and that he has conducted continuing legal education programs for attorneys on stock options and related issues. He testified that he had previously qualified as an expert witness in numerous family law and nonfamily law stock option cases.

Kessler explained that he had been retained to assist Barton in analyzing and evaluating the particular stock

options at issue in the malpractice case, and that in preparation for his analysis he had reviewed, among other things, the reports of the three certified public accountants who had served as expert witnesses in the marital dissolution case—Roland Nelson for the wife, Clifford Hersman for the husband while Barton represented him, and Larry Hay for the husband after Barton was fired and Gelbart and Skone were retained.

Kessler also testified that he had reviewed the stock option plan, the employee stock option plan, and the actual option grants. When asked what the significance of these documents was, Aubin's counsel interrupted and told the court that he would be objecting if Kessler should wander into areas that are properly expert opinions of lawyers. In response, Barton's counsel stated that most certainly he would be questioning Kessler about the factors that he believed germane to the determination of whether or not the Aubin grant was for past or future services, and Aubin's counsel stated that this was exactly what he would be objecting to because Kessler was a certified public accountant, not a lawyer.

After additional voir dire and colloquy between court and counsel, the following occurred:

> [MR. FRANKLIN, Barton's counsel]: Okay. Now, Mr. Kessler, based on the totality of your experience again, not speaking as a lawyer but speaking as a CPA, who assists lawyers in the proper characterization and evaluation of stock options, do you have an understanding as to what the threshold inquiry would be as to the determination of the proper characterization of a stock option as separate or community property?
>
> MR. GOULD [Aubin's counsel]: Objection, your Honor, asks for a legal conclusion from a layman. . . .
>
> THE COURT: All right. Let me tell you what my thinking is. And I am going to sustain the objection and I will tell you why. The analyses of community property law in Washington are legal analyses. They have been made by Courts and lawyers writing in treatises and Courts following, sometimes Courts following those treatises. But it's a—it is fundamentally legal

concept. I'm well aware of Mr. Kessler's experience and expertise as a certified public accountant and forensic accountant and that he has done a lot of work in this area and has thought about the mechanisms of what might feed into those legal analyses. But in the end, those are legal analyses. This being an action regarding legal malpractice, the experts who can testify must be lawyers. And I am going to continue to sustain objections to questions that ask Mr. Kessler to give opinions regarding legal characterization. Characterization of stock options is a legal question.

MR. FRANKLIN: Your Honor, with all due respect, I think that certainly if Mr. Kessler were testifying with regard to the standard of care, then he would have to be a lawyer. But he is testifying as to another aspect of this case which does not address the standard of care. It addresses an issue which is within the ambit of his expertise as an accountant and as evaluator and as analyst of stock and of stock options, then I don't—I am failing to understand.

THE COURT: No, I think you are right. I probably misspoke in that regard. He certainly can't as a CPA testify to the standard of care for a lawyer.

MR. FRANKLIN: Correct.

THE COURT: But as to his knowledge of what are fundamentally legal analyses and opinions regarding what a Court might do or how a legal analysis is reached, he cannot, does not have requisite expertise and I am going to continue to sustain those objections.

MR. FRANKLIN: Let me ask you in a different manner. Mr. Kessler, in your capacity as an expert assisting an attorney, have you analyzed the circumstances surrounding the issuance and the eventual grant of stock options to assist the attorney to make a determination as to whether the option was separate or community property?

MR. KESSLER: Yes, I have done that. . . .

MR. FRANKLIN: If one were to have the perspective of you as an analyst, a CPA and an analyst of stock options, if one were to approach the issue of whether or not an option was being granted for past services or future services, what factors would you look at and consider?

MR. GOULD: Objection, asks for a legal conclusion from a layman.

THE COURT: Sustained.

Report of Proceedings (Aug. 29, 2002) at 73-76.

During more colloquy between court and counsel, Barton's counsel argued that the corporate purpose for a stock option grant is a question of fact, not a question of law, but the court still would not change its ruling.

Barton's counsel then made an extensive offer of proof in order to preserve the issue for this appeal. Counsel explained that if permitted to do so, Kessler would testify regarding the line of inquiry he would undertake to ascertain the purpose of an option grant, that is, whether it was granted for past or present services. He would investigate the general corporate context and immediate past history from which the corporate action arose. This would include such things as changes in corporate direction, strategy and long range plans, including such things, in the Aubin case, as a consideration of the leveraged recapitalization, the anticipation of an initial public offering of stock, and the requirement by the venture capitalists that there be a stock option plan, both to be sure that they could retain key personnel and demonstrate that they wanted to retain key personnel. Kessler would examine the corporate documents relating to the stock plan and grant and would testify regarding the wide variety of stock option plans and the language used in explaining the purposes of various kinds of plans—including language not found in the Apex plan expressing an intention to reward employees for past services. Kessler would explain the significance of the vesting schedule, both as originally adopted and as amended, with respect to the issue at hand—the purpose for the stock option grant. He would explain the significance of additional agreements that were made in the case of Apex, including agreements to enter into a shareholder agreement and a lock up agreement at such time as the stock went public. And taking all of this into account, together with the deposition testimonies of Aubin, Saracino, and

Skone, all of which Kessler had reviewed, Kessler would opine as an expert that the stock options here at issue were in fact granted primarily for future services.

Kessler was allowed to continue testifying, but not on the purpose of the grant. The court allowed introduction of a schedule that Kessler had prepared for trial that calculated different stock share valuation and characterization scenarios for Aubin's stock options. Different community and separate values for the options were calculated based on the uncontested vesting dates and the possible purposes of the various stock options.

Six months after trial, the court entered findings of fact and conclusions of law. The court concluded that, based on the totality of the evidence, Aubin had proved by clear and convincing evidence that the primary purpose of the 1996 stock option grant was to reward Aubin and the other five key employees for their past services to Apex; thus, at the time the option was granted, during the meretricious relationship, the stock option grant was Aubin's separate property. However, because the 1996 stock options vested in the future, the court found that a portion of the stock options was granted for future employment and was separate property. Based on the testimony of Saracino, who opined that 70 percent to 75 percent of the 1996 grant was for past services, and Skone, who opined that at least 50 percent of the grant was for past services, the court found that 60 percent of the first stock option grant was Aubin's separate property.

The court concluded that Barton had failed to meet the minimum standard of care of a reasonable attorney in similar circumstances in her representation of Aubin because: (a) she failed to devote enough time to the matter to understand or explore the proper characterization of the stock options; (b) she failed to adequately prepare for the mediation; (c) a reasonable attorney would not have told Aubin that the settlement agreement was fair and equitable or agreed to the characterization of all the options as community property; (d) she failed to give Aubin, during the

mediation, relevant information concerning the true characterization of the stock options to allow Aubin to make an informed decision about whether to sign the agreement; and (e) she failed to give any recommendation or opinion at all regarding the agreement as a whole.

The court determined that as a direct and proximate cause of Barton's negligence, all of the options granted on February 2, 1996, were treated as community property when at least 60 percent of the grant ought to have been treated as Aubin's separate property under *In re Marriage of Short*, 125 Wn.2d 865, 890 P.2d 12 (1995). Because this was a short-term marriage, the court concluded that if the marital dissolution matter had gone to trial, Aubin would have been granted 60 percent of the first option grant as his separate property, and only 40 percent of the grant would have been treated as community property and divided equally between the parties.

In addition to the property loss, the court awarded Aubin a refund of the fees paid to Barton and the fees paid to Gelbart and Skone, with interest.

Both Barton and Aubin appeal. Barton contests various findings and conclusions of the trial court, protests the exclusion of her expert witness's testimony regarding the purpose for the option grant, and contends that the trial court miscalculated damages by failing to recognize that Aubin had already received half of the stock options in the marital dissolution action—thus, if Aubin is entitled to any judgment for property loss, he is entitled only to the remaining half of the 60 percent of the options that the court found to be his separate property because he was awarded the other half in the marital dissolution action.[2] Aubin challenges the trial court's determination that the

---

[2] Because we are reversing on other grounds, we will not be discussing the damages issues, which are rendered premature by our ruling. But we think from the record that Barton is correct in contending that the court failed to consider that he already had received half of the 60 percent of the stock options that the court ruled were his separate property. If, following our remand and the retrial, the matter again results in a judgment in favor of Aubin, the trial court should ensure that no "double dip" occurs in calculating damages.

appropriate date for measuring damages was the date on which the settlement agreement was signed.

## DISCUSSION

■ ■ A trial court's admission or exclusion of expert testimony is reviewed for abuse of discretion. *Esparza v. Skyreach Equip., Inc.*, 103 Wn. App. 916, 924, 15 P.3d 188 (2000). A court abuses its discretion in admitting or excluding expert testimony when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Hall v. Sacred Heart Med. Ctr.*, 100 Wn. App. 53, 58, 995 P.2d 621 (2000). However, evidentiary error will not be reversed absent a showing that the error prejudiced the defendant. *Kramer v. J.I. Case Mfg. Co.*, 62 Wn. App. 544, 562, 815 P.2d 798 (1991) (improper admission of surprise testimony is grounds for new trial only in circumstances illustrating that prejudice occurred).

■ Usually, the principles of proof and causation in a legal malpractice action do not differ from an ordinary negligence case. *Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985) (citing *Ward v. Arnold*, 52 Wn.2d 581, 584, 328 P.2d 164 (1958)). Where it is alleged that an attorney committed malpractice in the course of litigation, the trial court hearing the malpractice claim retries, or tries for the first time, the client's cause of action that the client contends was lost or compromised by the attorney's negligence, and the trier of fact decides whether the client would have fared better but for the alleged mishandling. *Daugert*, 104 Wn.2d at 257. Thus, to prove causation, the "client must show that the outcome of the underlying litigation would have been more favorable, but for the attorney's negligence. This proof typically requires a 'trial within a trial.' " *Kommavongsa v. Haskell*, 149 Wn.2d 288, 300, 67 P.3d 1068 (2003).

Here, Kessler was called to testify for the "trial within a trial" wherein the issue was whether Aubin would have fared better if he had gone to trial in the marital dissolution

action, rather than signing the settlement agreement. Thus, in effect, at the "trial within a trial" the court tried the Aubin marital dissolution case for the first time to determine whether, but for Barton's alleged negligence, Aubin would have fared better with respect to the characterization and distribution of the stock options.

We think the trial court would have had no difficulty whatsoever recognizing that Kessler's testimony was properly admissible, if this had been the marital dissolution trial itself rather than the "trial within a trial" for the malpractice claim. Indeed, it is highly unlikely there even would have been an objection to the testimony based on Kessler's professional credentials if this had been the actual dissolution trial. Indeed, at the mediation and subsequent marital dissolution proceedings, both sides relied entirely upon certified public accountants as expert witnesses regarding the purpose for the stock option grant, as well as the valuation of the options.

■ As *Marriage of Short* makes clear, the question of whether stock options were granted to compensate the employee for past, present, or future services requires a factual inquiry:

> To determine how unvested employee stock options are characterized under RCW 26.16, a trial court must first ascertain whether the stock options were granted to compensate the employee for past, present, or future employment services. *This involves a specific fact-finding inquiry in every case to evaluate the circumstances surrounding the grant of the employee stock options.*

*Marriage of Short*, 125 Wn.2d at 873 (emphasis added). Barton offered Kessler's testimony on the question of fact upon which the ultimate legal conclusion to be drawn by the court would turn: What was the corporate purpose for this particular stock option grant?

■ We hold that a certified public accountant having the requisite training, experience and professional credentials to analyze and value stock options, and who has done the

necessary groundwork before forming an opinion as to whether specific stock options were granted to compensate the employee for past, present, or future services, is qualified to testify as an expert witness at a marital dissolution trial, and at the "trial within a trial" in a legal malpractice action, on that factual issue—regardless of whether he or she also has a law degree. Here, Kessler was eminently qualified to render his professional opinion on that factual issue. Moreover, he was eminently qualified to discuss the ruling in *Marriage of Short* insofar as his understanding of the ruling affected his factual analysis. Certainly the ultimate interpretation of the court's ruling in *Short* requires legal analysis, but this is not to say that a certified public accountant testifying as an expert witness regarding the purpose for a stock option grant cannot be heard to explain his or her understanding and application of the factors described by the *Short* court, in reaching the expert opinion. Indeed, as Kessler explained during voir dire, the professional standards that govern certified public accountants require that they be able to read, understand, and apply relevant case law in the course of performing forensic support services.

In sum, the trial court's evidentiary ruling was based on an untenable ground, and constituted an abuse of discretion.

The next inquiry is whether the erroneous ruling prejudiced Barton. Certainly there is substantial evidence in the record that supports the trial court's findings of fact—the plaintiff did a good job of presenting his case in chief. But the erroneous evidentiary ruling entirely prevented the defendant from rebutting the plaintiff's evidence regarding the purpose for the stock option grant, so that, in effect, the trial court made its findings for the "trial within a trial" after hearing only one side of the case. As the trial court pointed out in the findings and conclusions, Barton failed to present evidence to rebut Aubin's evidence that the stock options were granted primarily to reward his past services to Apex. But the court failed to recognize that the absence of

evidence resulted from the erroneous evidentiary ruling that the court made some six months earlier, during the trial itself.

Such a fundamental error invalidates the verdict. Accordingly, we reverse the judgment and remand for a new trial at which the court shall hear and consider Kessler's testimony before reaching a decision in the "trial within a trial" phase of the action.

This ruling renders discussion of the remaining issues raised in the appeal and cross-appeal premature, in that the results of the "trial within a trial" will, in large part, govern the disposition of the malpractice action. To the extent that any of the other issues raised here may survive retrial, they may be raised again in any subsequent appeal.

Reversed and remanded for a new trial.

ELLINGTON, A.C.J., and SCHINDLER, J., concur.