******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

DE ANN MAURICE *v.* CHESTER HOUSING
ASSOCIATES LIMITED
PARTNERSHIP ET AL.
(AC 40742)

Bright, Moll and Bear, Js.

*Syllabus*

The plaintiff sought to recover damages for, inter alia, negligence from the
defendants, C Co., M Co., and S Co., in connection with injuries she
sustained when she slipped and fell on a patch of snow or ice in the
parking lot of certain property owned by C Co. Following a trial, the
jury returned a verdict in favor of the defendants. Thereafter, the court
denied the plaintiff's motion to set aside the verdict and rendered judg-
ment in accordance with the verdict, from which the plaintiff appealed
to this court. *Held*:

1. The trial court did not abuse its discretion in precluding the plaintiff's
expert witness, T, from testifying as an expert in the field of snow
removal; that court found that the testimony demonstrated that the T's
knowledge of snow removal was insubstantial and that it was tangential
to his real expertise in building codes and ordinances, T's testimony
revealed that his experience in snow removal was a minor part of other
jobs and that he had not attended any classes, taught any seminars or
read any materials or books on the topic, and it was reasonable for the
court to conclude from T's testimony that snow removal was a minor
part of his employment over the years and that his experience in snow
removal was little more than that common in the construction industry,
as the plaintiff's attorney failed to develop T's testimony to show that
his vast education in code compliance and ordinance enforcement and
his work experience qualified him as an expert in snow removal.

2. The trial court did not abuse its discretion in declining to render a default
judgment against C Co. as a sanction for the egregious actions of its
general and managing partner, W, in sexually harassing the plaintiff's
attorney on two occasions: that court, which awarded the plaintiff attor-
ney's fees and issued an order limiting W's movement in court, had wide
discretion to impose a sanction that it deemed appropriate under the
circumstances, and although the plaintiff argued that W committed two
egregious acts against R, those acts were brought to the attention of
the court only after the occurrence of the second act, more than one
year following the first act, and R did not ask for a mistrial or an
additional continuance; moreover, even though W's conduct was egre-
gious, the record revealed that he ceased such conduct immediately
upon the intervention of the court and the court's imposition of attorney's
fees and an order limiting W's movement in court, and there was no
indication that the conduct continued after the court's intervention.

Argued February 7—officially released May 7, 2019

*Procedural History*

Action to recover damages for personal injuries sus-
tained as a result of, inter alia, the defendants' alleged
negligence, and for other relief, brought to the Superior
Court in the judicial district of New London, where the
court, *Vacchelli, J.*, granted in part the plaintiff's motion
for sanctions; thereafter, the matter was tried to the
jury; verdict for the defendants; subsequently, the court
denied the plaintiff's motion to set aside the verdict
and rendered judgment in accordance with the verdict,
from which the plaintiff appealed. *Affirmed.*

*Kelly E. Reardon*, for the appellant (plaintiff).

*Sarah B. Christie*, with whom, on the brief, was

*Sarah Tischbein Bold*, for the appellee (defendant Something Natural, LLC).

*Jay F. Huntington*, with whom, on the brief, was *Kelly R. Wall*, for the appellees (named defendant et al.).

*Opinion*

BRIGHT, J. The plaintiff, De Ann Maurice, appeals from the judgment of the trial court, rendered in favor of the defendants, Chester Housing Associates Limited Partnership, MJKH Property Services, LLC, and Something Natural, LLC, following a jury trial. On appeal, the plaintiff claims that the court abused its discretion (1) when it did not allow the plaintiff's expert witness to testify as an expert in snow removal, and (2) when, in granting the plaintiff's motion for sanctions, it denied the plaintiff's request that the court render a default judgment as a sanction against Chester Housing Associates Limited Partnership as a penalty for the egregious misconduct of its general and managing partner, Douglas H. Williams.[1] We affirm the judgment of the trial court.

The following facts and procedural history inform our review. The plaintiff filed a second amended complaint alleging separate counts of negligence and private nuisance against each of the three defendants. In her complaint, she alleged that she lived at the Cherry Hill Apartments in the town of Chester (property), which was owned, operated, managed, controlled, and/or maintained by the defendant Chester Housing Associates Limited Partnership (property owner). The plaintiff also alleged that the defendant MJKH Property Services, LLC (property manager), owned, operated, managed, controlled, and/or maintained the property. Further, she alleged that, during times of inclement weather, the defendant Something Natural, LLC (snow removal company), was responsible for the snow and/or ice plowing, removal, clearing, and maintenance of the property, including all walkways, parking areas, common areas, and/or sidewalks.

The plaintiff further alleged that on December 12, 2013, as she walked from her apartment to her vehicle, which was in the parking lot of the property, she slipped and fell on a patch of snow and/or ice, and suffered injuries and an increased risk of future harm. The plaintiff claimed her injuries were caused by the negligence and the private nuisance caused or created by each of the defendants. Following a trial, the jury returned a verdict in favor of the defendants. The plaintiff, thereafter, filed a motion to set aside the verdict, which the court denied. The court, subsequently rendered judgment in accordance with the jury's verdict. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The plaintiff first claims that the court abused its discretion when it did not allow the plaintiff's expert witness, Mark Tebbets, to testify as an expert in the field of snow removal. She argues that she established, during voir dire, that Tebbets "had engaged in commer-

cial and residential snow removal, including removing snow from apartment complexes . . . [and that] his qualifications were sufficient to render him an expert in the field of snow removal . . . ." She further contends that "the court's decision to preclude [Tebbets'] testimony about snow removal, but allow his testimony regarding building codes, was clearly harmful to the plaintiff . . . ." We are not persuaded.

The following additional facts are relevant to this claim. The plaintiff disclosed Tebbets as an expert in the fields of "building codes, fire codes, [Americans with Disabilities Act (ADA)] accessibility, fall prevention, and safe snow removal." Tebbets' resume reveals that he has a Bachelor of Science degree in education, with a focus on "industrial arts, mechanical, electrical, carpentry and architectural drafting." He also attended a mechanical engineering program at Thames Valley State Technical College. Tebbets has additional training listed on his resume as follows: International Code Council's master code professional certification since 1998; Connecticut certified building official; Massachusetts building commissioner; property maintenance and housing inspector; certified zoning official of the Connecticut Association of Zoning Enforcement Officials; Occupational Safety and Health Administration (OSHA) and Environmental Protection Agency regulations; Connecticut Building Officials and Code Administrators building code updates; and ADA mandates regarding asbestos and lead abatement. Tebbets' resume also lists his extensive professional experience in: building code consulting and building, safety, and fire code compliance; ADA consulting and compliance; building energy code policies; the drafting of model legislation in support of stronger energy codes; teaching professional development seminars and classes regarding building code and inspection; and enforcement of OSHA regulations.

After the plaintiff called Tebbets to the witness stand, Tebbets discussed his extensive education and experience with codes and ordinances. He then testified about his experience with snow removal. Tebbets testified that he "shoveled snow for [his] mom and dad . . . [and] worked at a marina where . . . [he] plowed there. Eventually, [he] worked for different . . . contractors, [where] in the middle of winter, there's not a whole lot to do except come out in a snowstorm and shovel snow or plow." He testified: "If you look around, in the old days, every carpenter had a plow on the front of his truck, so I learned to plow when I was still in high school . . . ." He also stated that he had a multifamily dwelling that he owned and plowed and that his relatives owned a trailer park where he plowed, thereby "bec[oming] familiar with it just because it was the off-season and it was the thing you did." The plaintiff, thereafter, offered him as an expert on "snow removal and codes and ordinances."[2] The defendants objected

to his testifying as a snow removal expert on the ground that Tebbets had not set forth any expertise on the issue of snow removal. The court stated that, up to that point, it had not heard anything that would rise to the level of expertise in snow removal, but permitted the plaintiff to engage in additional questioning.

The plaintiff then asked Tebbets more questions about his snow removal background. Tebbets explained that he was involved with snow removal for the Mashantucket Pequot Tribal Nation where, although it had a public works department that did the actual snow removal, he, as the chief land use inspector, "had to do all the difficult things like figure out where things were supposed to go." He also testified that he "was involved with making sure that the lots, the walks—especially sidewalks with the people walking around—were cleared and properly draining." He testified that he was involved in snow removal while he worked in the construction industry, but he "got tired of using a shovel, so [he] kind of moved more [toward] the technical supervisor roles at that point," and he had begun supervising others who were removing snow and plowing. Further, he stated that when he was the zoning enforcement officer in Groton, he was responsible for reviewing site plans to assess whether plow trucks could move about without obstruction, as well as the appropriateness of the drainage systems being proposed.

The defendants again objected to Tebbets testifying as an expert in snow removal. The court then explained to the plaintiff's attorney that it had not heard anything that would rise to the level of expertise. It asked counsel whether Tebbets had gone to school or attended seminars on snow removal, or whether he had read any books or educational materials on snow removal, or whether he had taught classes or seminars. Counsel, again, was permitted to question Tebbets further.

The plaintiff's attorney then asked Tebbets if he had any training in snow removal or whether there is training or schooling for snow removal. Tebbets answered: "[T]he town of Groton had some, but not being a plow driver there, I didn't have to take their class on plowing. We were always more concerned about where they were plowing and directing them where not to plow." Tebbets then proceeded to explain that he had driven a pickup truck with a snow plow and had driven a big truck with a sander on the back. The plaintiff's attorney asked him if anyone had taught him how to do those things, and Tebbets said: "Well, they showed me how to drive and then they taught me how to plow and . . . how to plow routes. They taught me . . . [not to] stick [my] hand in the snow blower." The plaintiff's attorney then said: "Unless Your Honor wishes to direct some more questions, I'm not going to waste the jury's time any further, so I will offer him as an expert in snow

removal. If Your Honor does not find him to be an expert, we'll just move on." The defendants' attorneys stated that they still objected. The court stated: "Okay. Yeah. I'm not seeing how he has special expertise in it other than having done a little bit of it, and it's somewhat tangential to his real expertise. So I'll sustain the objection, but I will find him to be an expert in codes and ordinances." On appeal, the plaintiff claims this was error. We disagree.

"A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Conn. Code Evid. § 7-2. "The determination of the qualification of an expert is largely a matter for the discretion of the trial court." (Internal quotation marks omitted.) *United Aircraft Corp.* v. *International Assn. of Machinists*, 169 Conn. 473, 482–83, 363 A.2d 1068 (1975), cert. denied, 425 U.S. 973, 96 S. Ct. 2172, 48 L. Ed. 2d 797 (1976); see also *Weaver* v. *McKnight*, 313 Conn. 393, 405, 97 A.3d 920 (2014) ("[w]e review a trial court's decision to preclude expert testimony for an abuse of discretion").

"We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision. . . . Although we afford trial courts significant discretion, [w]here it clearly appears that an expert witness is qualified to give an opinion, the exclusion of his testimony may be found to be [an abuse of discretion]. . . . To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper. . . . If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party." (Internal quotation marks omitted.) *Fleming* v. *Dionisio*, 317 Conn. 498, 505, 119 A.3d 531 (2015); see also Conn. Code Evid. § 7-2.

"We also note our standards for admitting expert testimony. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Internal quotation marks omitted.) *Weaver* v. *McKnight*, supra, 313 Conn. 405–406.

We conclude that the court did not abuse its discretion in precluding Tebbets from testifying as an expert in the field of snow removal. The court found that the testimony demonstrated that Tebbets' knowledge of snow removal was insubstantial and that it was "tangential" to his real expertise in codes and ordinances. We agree with this assessment. Tebbets' testimony revealed that his experience in snow removal was a minor part of other jobs, whether in code compliance, ordinance enforcement, or building construction. He had not attended any classes or seminars on the topic, although he admitted that some were available to people who were employed as snow plow operators by the town of Groton, he had not read any materials or books on the topic, and he had not taught any seminars or classes on the topic. It was reasonable for the court to conclude from Tebbets' testimony that snow removal was a minor part of his employment over the years and that his experience in snow removal was little more than that common in the construction industry. The plaintiff's attorney simply did not develop Tebbets' testimony to show that his vast education in code compliance and ordinance enforcement and his work experience qualified him as an expert in snow removal. We cannot conclude, therefore, that the court abused its discretion when it evaluated the qualifications of Tebbets, as presented, and found that, although he was an expert in code compliance and ordinance enforcement, the plaintiff failed to establish that Tebbets had the requisite expertise to be qualified as an expert in the field of snow removal.[3]

II

The plaintiff next claims that the court abused its discretion when, in granting the plaintiff's motion for sanctions, it denied the plaintiff's request that the court sanction the property owner by rendering a default judgment against it as a sanction for the egregious actions of its general and managing partner, Williams, in sexually harassing the plaintiff's attorney on two occasions. The plaintiff argues that, despite the court's specific finding that Williams' purpose was to cause the plaintiff's attorney "distress for a litigation advantage" and "to try to knock her off her ability to proceed in the case," it "imposed a sanction that failed to adequately penalize Williams for his litigation misconduct." (Internal quotation marks omitted.) The plaintiff further claims that Williams' actions interfered with her attorney's ability to represent her. Although we agree that Williams' conduct was egregious, we are unable to conclude that the court abused its discretion in declining to render a default judgment against the property owner.

The following facts inform our review. On January 15, 2016, at 11:02 p.m., Williams sent an e-mail to the plaintiff's attorney, Kelly E. Reardon. The e-mail stated in relevant part: "Welcome to my web said the spider

to the fly. Am I the fly or are you? I think I'm the fly. Fare enough! What would like? What would you want me to do lie? I love women like you because you young girls have a direction that is 250% of what America is . . . about.

"Would you like to meet for coffee? Gee never had that one? Call if you want 860- . . . . The people in the case are not very nice people. This is not for just shits and giggles. Coffee would be great! I have nothing against your people. I think your great. Its just coffee. Have to dive 75 miles just to in joy a cup.

"Guess who is stupid? Me ok! You make my wheels turn. You are one sharp women. Bet your on top of your game. Did some MF say ATTORNEY. Call me to help me please.

"Thank you.

"beauty is in the eye of me, Oh ya.

"Not suppose to say this stuff so I will not say your a fox!!!! But you are. You asked me to call you and you didn't give me your cell.

"Old Goat

"Doug 860- . . . ." (Grammatical and spelling errors in original.)

After receiving the e-mail, Reardon notified her husband, her father, who also is an attorney in her law firm, and the police. The police thereafter warned Williams not to contact Reardon again. Reardon later spoke with the property owner's attorney about the e-mail. Neither the plaintiff nor Reardon informed the court about Williams' e-mail at that time.

More than one year later, immediately before opening statements were to begin on April 27, 2017, while Reardon and others were standing in a hallway outside the courtroom, Williams stated, loud enough to be heard by those present, including Reardon, her father, and at least one additional member of the bar who was not involved in this case, that he wanted Reardon to "sit on his fucking head." Almost immediately, Reardon reported to the court what had transpired, and she made an oral motion for sanctions. The court immediately held a hearing on the motion for sanctions, which then was continued to allow Williams to retain an attorney, thus delaying the start of trial. The January 15, 2016 e-mail also was discussed at the hearing. The plaintiff sought sanctions that included: (1) Williams be removed from the courtroom and sequestered; (2) a default judgment be rendered against the property owner and that the parties proceed to a hearing in damages; and (3) the court impose a financial penalty against Williams in an amount between $10,000 and $50,000.

The court issued an oral decision on May 3, 2017. The trial court specifically found that the purpose of

Williams' e-mail to Reardon "was obviously to threaten her, harass her, intimidate her, which the court believes was done for the purposes of getting some advantage in the case, to rattle her so that she'd do a poor job in representing her client, to scare her to get her to drop the case." As to the statement Williams made in the hallway of the courthouse, the court found that "considering the context and the purpose, which was essentially a sexual harassment of the plaintiff's attorney to try to scare her and rattle her, and obviously had that exact effect because during the April 27 hearing when the motion was made . . . Reardon was obviously very upset . . . and so he accomplished his purpose to try to knock her off her ability to proceed in the case, and to cause her distress for a litigation advantage." The court concluded that "these tactics were without any color of propriety and they were taken in bad faith . . . . There is no excuse for it, as obviously a bad faith tactic which is not condoned or permitted by any stretch of the imagination in court."

The court thereafter granted in part the motion for sanctions, explaining that "something is merited here due to the abusive, egregious behavior, but I don't think a default in a slip and fall case would be the appropriate penalty since we're trying to penalize the person, not the corporation really, even though he was doing it to benefit the corporation." The court then ordered Williams to sit in the back of the courtroom and to have no contact with Reardon, and it awarded attorney's fees to the plaintiff, in an amount to be decided after a hearing.[4]

Another of the plaintiff's attorneys then objected to the court's ruling allowing Williams to remain in the courtroom and to be in the hallway during recesses. The court explained that it had considered this issue, but that it was standing by its ruling. The attorney then stated that he would ensure that someone, likely security, would be present with Reardon at all times "because we don't have marshals any longer in the courtrooms, which is—unfortunately puts lawyers at risk."

"It has long been understood that [c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others. . . . For this reason, Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates. . . . These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. . . .

"[I]t is firmly established that [t]he power to punish

for contempts is inherent in all courts. . . . This power reaches both conduct before the court and that beyond the court's confines, for [t]he underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial. . . .

"Because of their very potency, inherent powers must be exercised with restraint and discretion. . . . A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. . . . [O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion. . . . Consequently, the less severe sanction of an assessment of attorney's fees is undoubtedly within a court's inherent power as well." (Internal quotation marks omitted.) *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 188 Conn. App. 21, 25–26, A.3d (2019), quoting *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 43–45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).

"It is well settled that the imposition of sanctions . . . rests within the discretion of the trial court and will not be disturbed on review unless there is an abuse of discretion. . . . Generally, a sanction should not serve as a punishment or penalty. Courts should be reluctant to employ the sanction of dismissal except as a last resort. Such drastic action is not, however, an abuse of discretion where a party shows a deliberate, contumacious or unwarranted disregard for the court's authority." (Citations omitted.) *Fox* v. *First Bank*, 198 Conn. 34, 39, 501 A.2d 747 (1985); see also *Emerick* v. *Glastonbury*, 177 Conn. App. 701, 736, 173 A.3d 28 (2017), cert. denied, 327 Conn. 994, 175 A.3d 1245 (2018).

In this case, we are not persuaded that the court abused its discretion in declining to render a default judgment against the property owner on the basis of Williams' misconduct. Although the plaintiff argues that Williams committed two egregious acts against Reardon, those acts were brought to the attention of the court only after the occurrence of the second act. Reardon did not bring to the court's attention the January 15, 2016 e-mail until the end of April, 2017, when Williams made a vile verbal comment to her in the hallway of the courthouse. Nor did she ask for a mistrial or an additional continuance. As egregious as Williams' conduct was, the record reveals that he ceased such conduct immediately upon the intervention of the court and the court's imposition of attorney's fees and an order limiting Williams' movements in court. Because there is no indication that the conduct continued after the court's intervention, we are unable to conclude that the court abused the wide discretion afforded to it when

it imposed a sanction that it deemed appropriate under the circumstances.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff also makes a passing claim in her appellate brief that the court erred in denying her motion to set aside the verdict. The plaintiff's appellate brief contains no standard of review for the denial of a motion to set aside the verdict, and it contains no legal analysis regarding such a claim. Rather, she sets forth the statement that the court erred in denying the motion to set aside the verdict, with little more. Accordingly, we deem any claim related to the court's denial of her motion to set aside the verdict abandoned. See *Stacy B.* v. *Robert S.*, 165 Conn. App. 374, 376 n.1, 140 A.3d 1004 (2016) (claim merely raised in passing, deemed abandoned).

[2] We note that it is not necessary for a party to ask that the court recognize the witness as an expert before asking the witness to provide an opinion. *Nicholson* v. *Commissioner of Correction*, 186 Conn. App. 398, 420–21, 199 A.3d 573 (2018), cert. denied, 330 Conn 961, 199 A.3d 19 (2019). The proponent of the expert simply must lay the necessary foundation before asking the witness a question that calls for an expert opinion. If there is no objection to the question, the witness may give the opinion. If there is an objection to the witness' qualifications or to whether the witness' testimony will assist the trier of fact, the court can then rule on the objection in the context of the specific questions asked. We believe that this procedure has several advantages over one asking the court to accept or recognize a witness as an expert. First, asking the court to recognize a witness as an expert suggests that the court may refuse to do so even in the absence of an objection. It cannot. Id. Requiring an objection to a question that calls for an opinion and then a ruling from the court is much more consistent with our adversarial system and the manner in which virtually all other evidence is admitted or excluded at trial. Second, accepting counsel's invitation to recognize or accept a witness as an expert risks "influencing the jury in its assessment of the credibility of the witness by announcing that the court is blessing or endorsing the witness." E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 7.4.1, p. 449. Third, the court is in a better position to rule on issues relating to a witness' qualifications and fitness for a particular case when the objection relates to the specific questions that will elicit the opinion to which an objection is raised. It would not be unusual at all for an expert to be qualified to answer one question on a subject, but not qualified to answer other questions on that subject. Consequently, we suggest that litigants abandon the practice of asking trial courts to recognize or accept a witness as an expert. For the same reasons, we encourage trial court judges to decline any such requests from the parties.

[3] We also note that the manner in which the plaintiff presented and the court resolved whether Tebbets was qualified to testify as an expert on snow removal would make it impossible, if the court had erred in concluding that he was not qualified, for us to determine if the plaintiff was harmed by such an error. The plaintiff never proffered a question about snow removal that she wanted Tebbets to answer and never made an offer of proof as to what testimony Tebbets would have offered if permitted to do so. Consequently, there is nothing in the record that would tell us how helpful, if at all, any testimony from Tebbets regarding snow removal would have been to the plaintiff. This problem might have been avoided had counsel simply asked Tebbets for an opinion, requiring the defendants to raise any objection in the context of the specific question asked. See footnote 2 of this opinion.

[4] Williams filed a writ of error after the imposition of the sanctions, which this court later dismissed. *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 188 Conn. App. 21,      A.3d      (2019).