
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TAMERA SWAGER AND MARTY SWAGER, husband and wife, | ) ) ) | No. 38438-1-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| CCM HOLDINGS, L.L.C., a Washington Limited Liability Company; WILLIAM G. HANVEY AND KATHLEEN M. HANVEY, individually and in their marital community; VALUE VILLAGE STORES, INC., a Washington Profit Corporation; JOHN DOE I-X, | ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |
| INLAND LAWN INC., a Washington Profit Corporation | ) ) ) | |
| Respondent. | ) | |

FEARING, J. — This appeal raises a variety of issues stemming from appellant Tamera Swager's (Swager's) slip on ice in Spokane's Value Village's parking lot. Her fall caused serious injuries to her ankle and leg. Swager gained partial success against Value Village and the store property's owner, but a jury ruled in favor of Inland Lawn, the contractor hired to remove snow and ice from the parking lot. Swager and her husband appeal rulings leading to the verdict vindicating the contractor. Swager assigns

error to exclusion of postinjury correspondence between Value Village, the property manager, and Inland Lawn and to the preclusion of testimony from an expert on snow removal. She assigns instructional error and error in denying a motion to dismiss the affirmative defense of comparative fault. We conclude that the superior court committed prejudicial error when excluding testimony from Lisa Rose, a snow and ice removal expert.

## FACTS

This lawsuit arises from Tamera Swager's slipping on inclement conditions in the parking lot of Spokane's uptown Value Village on January 4, 2017. In addition to suing Value Village, Swager and her husband sued the property owner, CCM Holdings, Inc., and the snow removal contractor, Inland Lawn. Inland Lawn is the only respondent on appeal. During the winter, Inland Lawn performs on contract, for numerous property owners, snowplowing, parking lot and sidewalk snow removal, sanding, and deicing.

By 2017, Value Village property's owner, CCM Holdings, Inc., had contracted for more than ten years with Inland Lawn to perform ice and snow removal on the store's premises. Under the one-page contract, Inland Lawn traveled to Value Village if snow reached two inches. Inland Lawn sprayed a liquid deicer to the parking lot with a tank truck, plowed the snow in the parking lot, and removed snow from the sidewalks along the premises. The sidewalk crew worked separate from the plowing and deicing crew. The contract also afforded Inland Lawn the opportunity to apply liquid deicer before or

2

after a storm. Inland Lawn determined the amount of deicer to apply and it charged for the deicer by the pound. The contract also read that Inland Lawn would apply sand only if requested.

Inland Lawn does not offer customers the service of monitoring premises after snow removal. No one with Value Village or CCM Holdings spoke to Inland Lawn about monitoring the premises after performing instances of snow removal or application of deicer.

Deicing lowers the freezing temperature of the snow and ice so that the snowplow can remove the precipitation at a lower level on the pavement. Deicing also keeps the parking lot safer. A deicer lasts one to two days. Kelly Peterson, part owner and manager of Inland Lawn, testified at trial that he did not know what occurred after the deicer waned in effect.

Inland Lawn removed snow and ice from Value Village's parking lot on the morning of January 1, 2017. A snowplow plowed and a truck applied 35 gallons of liquid deicer. A separate crew removed snow from sidewalks and applied granular deicer to those walkways. Inland Lawn repeated the same tasks that evening because of a surprise second storm. Inland Lawn applied no sand, either in the morning or evening, because the property owner's manager never requested its use. The cost of applying sand would been in the range of $150 to $175 for the entire premises.

3

Kodi Bilbrey, now Inland Lawn's operations manager, testified at trial that he was one of the workers clearing the parking lot on January 1, 2017. Bilbrey avowed that he had performed snow removal on Value Village's parking lot at least fifty times before.

Inland Lawn did not return to the property until January 7, 2017, because no new snowfall exceeded two inches. Without this triggering frozen precipitation, the company would not receive payment for additional services.

At midday on January 4, 2017, Tamera Swager and her husband, Marty, intended to shop at Value Village. They had just exited an adjoining building where they sought counsel from an attorney. They traversed a city sidewalk between the office building and the discount store.

Before leaving the sidewalk and entering Value Village's parking lot, Tamera Swager noticed "[c]ompact snow and ice" on the lot. Report of Proceedings (RP) at 1151. The parking lot appeared "dirty," such that both she and Marty Swager assumed traction material had been laid on the ice. Each judged the parking lot to be safe on which to walk.

Tamera and Marty Swager entered the parking lot and walked toward the Value Village entrance. During cross-examination, Swager declared:

> Q. As you're walking, you know, 20 feet into that parking lot, did you ever look down and see traction material?
> A. I didn't look down.
> . . . .

4

Q. Okay. At any time between that zero to 20 feet, did you look down on what you were walking on?
A. When we first entered the property.
. . . .
Q. All right. And was that the only time you looked down when you were walking into that parking lot?
A. Well, I was looking straight. So, of course, I can see exactly where I'm going. I can see what was in front of me.
Q. All right. Did you see traction material as you were looking forward?
A. Like I said, it was dirty.
Q. Dirty with just dirt or material?
A. I have no clue. It was dirty. So it could have been traction material. I didn't know.

RP at 1183-84.

Within twenty feet of entering the parking lot, Tamera Swager slipped and tumbled to the iced pavement. Marty, who walked ahead of Swager, heard her say "I hurt myself." RP at 889.

An individual who observed Tamera Swager's fall called 911. Ronald Hunter, Value Village's store manager, learned of Swager's fall and left the store to gather information from the Swagers. An ambulance arrived on the premises and transported Swager to the hospital.

A family friend, Scott Mankin, arrived at the store to drive the couple home after they had completed shopping. Mankin testified at trial concerning the conditions in the parking lot that he encountered:

Q. So when you got out of your car—or, I guess, more generally, what were the conditions of the parking lot that you saw there?

5

A. Super icy and very slick and the closer I got to the ambulance, the slicker it got. And then as I looked toward the street, you could see where it was rutty, bumpy, where people, maybe, driven and droven [sic] through it, and then it froze and got pretty treacherous from the sidewalk in and then it smoothed out as it got closer to the drain and the hill. There's, kind of, a serious grade in that parking lot where it drains down.

Q. Yeah. But how much—can you describe how much of the parking lot was covered in that condition?

A. From the time I started walking, it was pretty much all ice. So I would say, you know, three quarters of that parking lot where I was. I can't attest to where the cars were parked, but, where I was walking down to where they were, it was all ice.

. . . .

Q. Okay. Okay. So could you—the part of the parking lot where Mr. Swager and the ambulance were, can you describe the—what you saw with respect to this ice in more detail?

A. It was—it was slick and smooth and super icy, super slick. And, like I said, I didn't—when I went and looked down at the other spot, you could see [that] the ice just seemed to get thicker and more uneven and more rutty as you went away towards the street which would be the south. Going south in that parking lot, it got more—way more icy and rutty and slick, uneven. Where the ambulance was [it] was pretty even, but it was ice, just all ice.

. . . .

Q. So did you see any traction material like sand or deicer on that part of the parking lot?

A. No.

. . . .

Q. And you yourself walked from your car down to the ambulance to speak to Mr. Swager?

A. Yes.

Q. Did you have any trouble walking yourself?

A. I was very careful, yeah. It was very slick.

.

RP at 468-74.

When asked at trial, if Value Village's parking lot should have been free from ice,

Kelly Peterson, manager of Inland Lawn, responded that "[a]ttempts should be made to

6

keep it clear." RP at 536. Peterson agreed that someone should monitor the parking lot for ice, although he denied that Inland Lawn should be the one to conduct the monitoring. Peterson would expect that, if the property owner or manger noticed slippery conditions in the parking lot after Inland Lawn's work, someone would contact Inland Lawn. If an employee of Inland Lawn was nearby, he or she might check on conditions. Peterson denied that Inland Lawn should have conducted discussions, in advance of January 1, 2017, with Value Village or CCM Holdings about who should perform monitoring.

When asked if sand or other bracing material should be placed on an icy parking lot, Kelly Peterson answered that Inland Lawn defers to the property owner or manager for deciding whether to apply sand. Some property owners do not desire the use of sand because the sand decomposes the asphalt and striping and requires clearing in the spring.

At trial, Tamera and Marty Swager sought to introduce a series of e-mails among representatives of Value Village, CCM Holdings, Inland Lawn, and an insurance agency. Swager's fall precipitated the e-mails. We do not correct the spelling or punctuation of the messages exchanged in the e-mails.

On January 4, 2017, at 1:29 p.m. and shortly after Tamera Swager's spill, someone at the Spokane Value Village store sent an e-mail to "Risk Insurance" with the subject line of "New Incident Entered →Store Number 1014 → General Liability / Responsabilite civile." Since Value Village maintains a presence in Quebec under the

7

name of Village des Valeurs, we assume some of the spelling in this subject line

employed French words.  The 1:29 e-mail read:

> Loss Date: 1/4/2017
> Report Date: 1/4/2017
> Location: 1014 Spokane
> Claim Number: 2017511363
> Name: Tamara Swager
> Accident Description: Person was visiting a neighboring business
> and was walking into parking lot to meet her ride.  She slipped and fell on
> the ice at the entrance of the parking lot.  She was transported to Sacred
> Heart Hospital.

Clerk's Papers (CP) at 379-80.

On January 4, 2017, at 2:50 p.m., Value Village's Risk Manager Sheri

Blankinship e-mailed the company's Facilities Manager Darren Farwell.  Both the risk

manager and the facilities manager work from company headquarters in Bellevue.  The

subject line for the e-mail read: "Customer Claims (2) out of Store 1014 Spokane."  CP at

1633.  The body of the message declared:

> In the last 3 weeks we have had two "customers" fall in the parking
> lot and both have been transported via ambulance to the hospital.  The
> winter maintenance company has plowed the lot, but ice remains under the
> snow due to the frigid temperatures.
> I'm not sure what, if anything can be done, but wanted you to be
> aware of what can be two costly claims for the organization.
> My interpretation of the lease is that the LL is responsible for the
> parking lot.  Would you agree?  If this is accurate we will more than likely
> deny these claims and tender them to the LL.
> If you know who the winter maintenance company is and/or have a
> contract, can you forward that to me?

CP at 1633. We assume that that "LL" stands for landlord. We further presume that the portion of the message following each "DF" is Farwell's response to Blankinship's comments and questions.

On January 16, 2017, at 3:33 p.m., Value Village Facilities Manager Darren Farwell electronically wrote to Value Village Risk Manager Sheri Blankinship and Shelley Martinez, an employee of CCM Holdings, the property's landlord:

> Sheri,
> See below, In response to your questions. I've included the IL [Inland Lawn] on this email and I'll request that they immediately "Ramp UP" the snow and ice clearing service and maintenance.
> Shelley,
> Please see the below email and pictures. There have been 2 major accidents in the Value Village parking lot where folks have had to be removed via ambulance. These claims will be forwarded to IL. The vendor that performing service needs to start sanding the parking lot to help eliminate the slip and falls, where compact snow and ice cannot be removed.
> Thanks
> Darren Farwell

On January 16, 2017, at 4:03 p.m., Shelley Martinez wrote to Tom Siebert, a representative of Payne West Insurance Agency in Spokane, and Kelly Peterson, part owner and manager of Inland Lawn:

> Tom,
> Below is some claims for people who [fell] at Value Village. Please contact below to get the details.
> Kelly,
> Please get this parking lot rocked with deicer make sure this is a lot of this after you plow.

9

On January 17, 2017 at 8:54 a.m. Shelley Martinez messaged Darren Farwell and

Tom Siebert:

> Tom,
> I don't know anything about the claims or accidents. Please contact
> Darren to get the Information. Have the ajuster [sic] call him or his
> employees at the store.

At 10:31 a.m. on January 17, 2017, Tom Siebert responded to Shelley Martinez:

> I will email Darren the below info .... And he will be our contact for
> the claim.
> Thanks
> Tom Siebert

At 11:02, on January 17, 2017, Tom Siebert with PayneWest e-mailed Darren

Farwell:

> Hi Darren,
> Below is the claim number and an adjuster will be calling you in
> the next 24-48 hours.

At 2:49 p.m., CCM Holdings representative Shelley Martinez sent an electronic message

to insurance agent Tom Siebert:

> Tom,
> Just wanted to let you know that we have a full time crew that does
> the snow removal & de-icing this property almost everyday. But because
> of the weather in single digits some of the deicer is not working. But they
> do have rock in it to give the customers grip & to show that it is on the
> ground but that does not mean they can not walk with caution.

At 4:45 p.m., Darren Farwell wrote to Tom Siebert:

> Tom,
> FYI, I know nothing about the incident, other than what's in this
> email.

No. 38438-1-III,
*Swager v. CCM Holdings, LLC*

   Darren Farwell
   Facilities Manager

Tom Siebert wrote to Shelley Martinez, on January 18, 2017, at 8:56 a.m.

   Who should the adjuster contact regarding the slip and falls ....
Below Darren does not appear to handle.
Thanks

Shelley Martinez responded at 9:29 a.m. the same day:

   Have them contact the onsite Manager (Ron) he can tell you the
whole stories.  509-325-2569

PROCEDURE

Tamera and Marty Swager sued Value Village, Inc., CCM Holdings, Inc., and Inland Lawn.  The couple alleged each defendant's negligent conduct caused Swager's injuries resulting from her fall in the Value Village parking lot.  The defendants asserted the affirmative defense of comparative fault.

Before trial, the parties filed motions in limine, some of which sought the opposite relief of the other side's motions.  Tamera and Marty Swager moved to admit the e-mails, marked as Exhibit (Ex.) P109, exchanged between agents and employees of CCM Holdings and Value Village.  CCM Holdings and Inland Lawn asked to exclude the e-mail messages.  The Swagers never asked the court to admit one or more individual e-mail as opposed to admission of all e-mails together as one exhibit.

When arguing against admission of Exhibit P109, the defendants argued for exclusion because the messages related subsequent remedial measures and referenced

11

insurance. The Swagers argued for the admission of the e-mails under ER 407 and 411 on the basis that the communications established Value Village's control over the parking lot and the messages showed the ability to remove some or all of the ice from the lot. The Swagers anticipated each of the three defendants to respectively claim that another defendant controlled operations on the parking lot. Value Village, however, agreed it controlled the parking lot and denied any contest over the control. All defendants also agreed that Inland Lawn or any other defendant could have applied sand and the feasibility of other measures. In response to Value Village's concession, the Swagers argued that the question of control could still arise during trial.

The trial court excluded Ex. P109 as evidence of subsequent remedial measures. The trial court also granted CCM Holdings' motions to exclude any testimony or reference to liability insurance or to the sanding of the parking lot after Tamera Swager's fall. The trial court denied the Swagers' additional motion in limine to preclude any arguments or inferences that Swager assumed the risk of falling when she attempted to shop at Value Village.

Tamera and Marty Swager hired Lisa Rose to testify to the obligations of the property owner to vet and monitor the performance of a snow removal contractor and to opine about the duties of a snow removal contractor. Rose testified during an offer of proof proffered by the Swagers.

12

Lisa Rose is a snow and ice removal consultant headquartered in the snow belt

buckle, Erie, Pennsylvania. According to Rose, a snow and ice consultant is now

considered a professional that holds expertise. Snow removal has advanced since a man

attached metal to his pickup and plowed snow in the middle of the night. Rose sought to

inform the jury about steps to be taken by contractors to mitigate snow and ice hazards,

policies and procedures employed to prevent slip and fall incidents on commercial

parking lots, and standards in the snow removal industry.

Lisa Rose has worked in the snow and ice removal industry since the 1990s. She

began as a dispatch operator. She progressed to inspecting properties, managing the

snow removal operations of a local landscape company, and managing the operations of a

national snow removal company, Snow Management Group. In the last position, Rose

oversaw 3,500 employees and subcontractors.

Lisa Rose received accreditation from the Accredited Snow Contractors

Association. She is also a member of the Snow and Ice Management Association.

Finally, Rose is a member of the Snow Fighters Institute, which provides education for

snow removers and property managers. She served as copyright editor and proof reader

for two snow and ice related books authored by John Allin, her colleague at Allin/Rose

Consulting, Inc.

One of the books Lisa Rose edited establishes snow and ice management protocols

and standards and is known as the snow and ice management Bible. Rose conceded the

standards published in the book are not legally binding. She does not know whether any

Spokane snow remover follows the standards. The questioning of Rose did not unearth

the extent to which the standards have been publicized, broadcast, or adopted. Rose

avowed that the standards that apply to Erie, Pennsylvania also apply to Spokane. We

refer to this assertion as the Erie doctrine.

In one passage of her testimony, Lisa Rose averred:

> Q. And do the standards that you know of now, you know, or back in 2016, 2017, do the standards differentiate between each state or is it, you know, pre, post—or pre, intra, post event types of activities that you have to perform as a snow and ice consultant or contractor?
> A. The standards do not vary state to state because, you know, again, state to state you still want a written plan, you want a snow response plan, you want communications documented, you want that clear between all involved parties. That doesn't matter if you are—it doesn't matter where you are. You want those standards for sure.

RP at 619.

Lisa Rose, during the offer of proof, expressed no criticism of Inland Lawn's

performance on January 1, 2017, when the contractor plowed and spread magnesium

chloride, a liquid deicer. Nevertheless, according to Rose, if the magnesium chloride

worked, the snow on the parking lot would have undergone melting and later refreezing.

According to Rose, a contractor should return to the location the following day to inspect

the work performed. Inland Lawn failed to do so.

During cross-examination, Lisa Rose declared:

14

Q. Okay. You have some opinions I've seen that the contractor needs to do a followup inspection the next day to make sure their work was appropriate.

A. Yes.

Q. Okay. Now, do you know if any snow and ice contractor in the Eastern Washington or North Idaho region actually had the practice of doing a followup inspection after they serviced a parking lot the following day?

A. I can say that they should if they're following the standards. And, if we would consult with them, they would. But I don't work for any of those companies. So I can't answer that.

RP at 624-25. The cross-examination of Rose continued:

Q. What is—what supports—what is the basis of your opinion to support your—the opinion that my client [Inland Lawn] should have inspected the property between January 1 and January 4?

A. Zurich Insurance provides that awareness and accountability providing safe walking surfaces. So there's an insurance component that talks about that's something that should be done.

Q. Does that insurance component indicate to you the number of times an inspection should be done between January 1 and January 4?

A. Let me also say that there's another portion that says an effective snow and ice removal plan should be in place, and an inspection would be part of a snow and ice removal plan. And, no, none of these standards will tell you a number of inspections because that is going to be based on multiple factors: the weather conditions, the communications and plan, and monitoring agreed upon between the companies or involved parties. BOKA—I'm sorry BOMA [Building Owners and Management Association], which I already spoke of, speaks about making sure that the staff members or snow removal vendor aggressively handles ice patrols. It's also pretty much commonsense. I know I'm here as an expert, but it is a commonsense situation that a site has to be looked at. It has to be inspected.

Q. Is it your position that had CCM Holdings done a site inspection January 3rd, they would have detected this condition that Ms. Swager reported January 4th?

A. It's a whole lot better possibility than not doing it at all.

Q. It's a possibility, right? That's what you said?

15

A. Well, of course. They would have seen that there were icy conditions. There was no treatment between January 1 and January 4.

Q. But you've testified that you have no knowledge of what the conditions on the property were between January 1 and January 4, correct?

A. Well, she slipped and fell on ice on January 4, so there was ice on January 4.

Q. Okay. And that's all you can say, right?

A. Yeah.

RP at 635-37.

During the voir dire of Lisa Rose, the trial court questioned Rose:

THE COURT: And so the purpose of the standards is related to liability. You agree with that?

THE WITNESS: Yeah because safety is our number one job or crisis management. All the parties involved dealing with snow and ice is crisis management.

THE COURT: What scientific information did your organization collect that would indicate that a vetting—a proper vetting procedure, as you've used that term, changes the liability perspective for a property owner in the State of Washington?

THE WITNESS: I can't say that we've collected scientific evidence in the State of Washington.

THE COURT: Any anywhere?

THE WITNESS: Well, my years of experience show when I ran a snow management company, I would vet providers before awarding locations to them. And I think it matters because you do end up with a better quality service provider.

THE COURT: Do you have any data?

THE WITNESS: I'm not sure—I'm sorry. I'm not sure if that answered your question.

THE COURT: Do you have any data that you could provide to this Court that would show that a properly vetted snow removal contractor— snow and ice removal contractor is necessarily different than someone who doesn't follow the standards but just does the job?

THE WITNESS: I don't have scientific evidence to that, but that is why we put the standards in place because we know they work. We wouldn't create standards that—

16

THE COURT: Who funds your organization?

THE WITNESS: Allin Rose consultant? Or—

THE COURT: Let's go to the snow—

THE WITNESS: Snow and Ice Management Association, to my understanding, is a nonprofit. And it was started by John [Allin]—

THE COURT: Who funded them? Who funds them? They may be a nonprofit. That doesn't mean Mr. [Allin] is simply paying for all of the expenses, correct? Does he have members of that organization?

THE WITNESS: Well, let met [sic] clarify. It's not John [Allin's] organization. He was one of the original founders. But it's founded by members now.

THE COURT: Who are the members?

THE WITNESS: It could be property management companies. It can be snow and ice management contractors. There are weather individuals, meteorologist, forensic weather people.

THE COURT: Are you aware of any scientific data or accident reconstruction data collected by the Snow and Ice Management Association at any point in time?

THE WITNESS: No.

THE COURT: How about for the Accredited Snow Contractor Association? Same question, are you aware of any scientific or accident reconstructed data that they have collected?

THE WITNESS: Well, I don't run ASCA or SIMA.

THE COURT: I'm not asking if you ran it. I'm asking if you are aware of any scientific data that they collected.

THE WITNESS: Well, I read their trade organization publications, and those have scientific data articles in them. But I don't know that they've collected them. So I guess I would have to say no.

THE COURT: Are the standards that you are relying upon either the SIMA or AS—

THE WITNESS:—CA.

THE COURT: Are those standards, to the best of your knowledge, adopted by any governmental entity?

THE WITNESS: No.

RP at 638-41.

17

In addition to faulting Inland Lawn for failing to monitor conditions after January 1, Lisa Rose faulted Inland Lawn for failing to sufficiently document the work performed and failure to sufficiently define the scope of its work in its contract with CCM Holdings. According to Rose, the parties should have assigned someone as responsible for monitoring parking lot conditions. In turn, Rose criticized CCM Holdings for not vetting Inland Lawn before hiring it and failing to clearly outline the duties of Inland Lawn under the snow removal contract.

After hearing the offer of proof, the trial court determined that Lisa Rose qualified as an expert because of her experience in the snow removal industry. The court considered Rose's relevant opinion to be that Inland Lawn performed deficiently by failing to return to the parking lot after January 1. Nevertheless, the trial court precluded Rose's testimony because her opinions were not "necessary for the trier of fact to understand the circumstances at issue." RP at 658.

We relate some of the astute comments of the trial court. Some of the comments suggest the trial court based its ruling on factors other than helpfulness to the jury.

> I do not understand what scientific, technical, or other specialized knowledge is necessary for the trier of fact to understand the evidence being presented or to determine the fact in issue.
> In other words, I don't find that Ms. Rose has any ability to explain scientific facts or technical knowledge about snowplowing, snow removal, ice removal, ice treatment. I didn't hear her say that she's got any education in magnesium chloride. I didn't hear her say that she's done any scientific studies or technical research that shows that the standards that she

supports make any difference in accident rates at locations where she's studies that.

She has an opinion because she belongs to an association that wants to market itself as creating higher standards to share liability. That was what I understood her to say. That liability and that sharing of liability, if it exists, exists under Washington law. So I'm struggling as to what testimony she has that would be of assistance to the trier of fact in this case.

RP at 642-43.

I do not have anything that says these are widely used standards. Ms. Rose says those standards have not been adopted by any governmental entity that she's aware of.
. . . .
But no comparison with the people that do the work. There's certainly nobody in Spokane, Washington, that she's aware of. She didn't say anybody here that belongs to that organization. She didn't say that there's any measure for what that is. It might be that everybody in New York City belongs and nobody in Upstate New York belongs. I don't have any of that such information.

RP at 646.

And nobody raised the issue, but I'm very concerned that the purpose is how much does it cost if you want to have a snow and ice removal contractor here, that there might be a snow event, they rush out establish pre-service conditions—or pre-event deicer; they then go back do the snow removal; then they go back and do the post-ice or event deicing; and then they go back a fourth time to further observe.

Nobody's raised that question. But certainly it's a question that the defendants—and nobody's established that that's necessary in order to properly create a safe condition for people that come upon your parking lot.

RP at 647-48.

So those standards don't necessarily have anything to do with safety. And that was my question of this witness. So I'm concerned about where the scientific, technical, or specialized knowledge necessary or helpful to the finder of fact element comes in. There was—she doesn't have any data.

19

She doesn't have anything other than, we sat down as a group and said if you, as a snow removal contractor, can say we've come a long way from hanging a piece of metal off of your truck and pushing snow around. You might be able to be more professional. You might be able to charge more for your services. You might be able to do more servicing.

RP at 649-50.

But she has no knowledge. She's never been to this site. She has no knowledge presumably of the grade, of the shape, of the square footage. She has no knowledge of how snow and ice forms. She wasn't asked, at what temperature does magnesium chloride work? Does it work at 32 degrees? Does it work at 28 degrees? Does it work at 5 below? I don't know that. I don't know that she knows that.

RP at 651.

But she doesn't testify that there was a hazardous condition on January 4th.

RP at 651.

And what I'm concerned about is Ms. Rose appears to the Court to commence her analysis from a baseline that I don't understand how her area, her training, experience, knowledge qualifies her to provide that information because it has to be some sort of technical, scientific, or specialized knowledge that would enable her to provide some piece of information that would be of benefit to the finder of fact, the jury.

RP at 652.

And what I'm asking is what the technical scientific or other specialized knowledge that shows possession of policies and procedures changes the outcome.

RP at 653.

I'm not saying she has to rely on specific scientific information. I'm saying what evidence is there that says these—and I asked her specifically,

are you aware of any improved outcome, any scientific studies, any data
collected by you or any of the organizations that you belong to that would
show that the outcome would be different because of policies and
procedures. I didn't hear any, yes, Your Honor. Here it is.

RP at 653-54.

At the close of testimony, Tamera and Marty Swager moved for judgment as a

matter of law on the affirmative defense of comparative fault. The Swagers argued that

defendants did not produce sufficient evidence for a jury to find that Swager acted

unreasonably under the circumstances. They highlighted that no witness expressly

testified that Swager failed to exercise ordinary care under the circumstances, nor that the

route she took to the store was unreasonable. The trial court denied the motion to dismiss

the defense.

Tamera and Marty Swager and Inland Lawn sought a jury instruction on a

contractor's duty to invitees. The Swagers relied on *Williamson v. Allied Group,* 117

Wn. App. 451, 72 P.3d 230 (2003) to propose an instruction using the language of

Restatement (Second) of Torts § 383 (AM. L. INST. 1965):

> One who does an act or carries on an activity upon land on behalf of
> the possessor is subject to the same liability, and enjoys the same freedom
> from liability, for physical harm caused thereby to others upon and outside
> of the land as though he were the possessor of the land.

Plaintiffs' Proposed Jury Instruction 10, CP at 1230. Inland Lawn believed the

Swagers' proposed instruction to be an incomplete statement of the law and requested an

instruction based on Restatement (Second) of Torts § 384 (1965). Early in the trial, the

21

trial court commented that Inland Lawn owed a duty to Tamera Swager and expressed an intent to deliver a jury instruction on a contractor's duty to invitees on business premises. According to the court, a jury could conclude that Inland Lawn negligently performed its services on January 1 and created a dangerous condition that existed when Swager fell on January 4. The trial court added: "[W]e'll get there with regard to the [contractor] instruction." RP at 1252. Nevertheless, at the conclusion of trial, the court included no such instruction. The Swagers objected to the failure to give an instruction. During closing, Inland Lawn's counsel intoned:

> Kodi [Bilbrey] is now operations manager. And I asked him the question, would you say, you know, you serviced this property at least ten times per winter conservatively? He said, yes. So by the winter of 2016-'17, he himself personally had done this same route, this same job, the same scope of work, more than 50 times. You know, in some ways, he could consider himself—you could *consider him as an expert in this field*.

RP at 1385 (emphasis added).

> Again, what evidence did you hear that Inland Lawn did something wrong? *Did any witness in this case testify, I expected Inland Lawn to come back and check my property on January 2nd? No.*
> And I asked my clients, how come you didn't go out for three days? And it was real simple, no one called us back out, and we're not the monitoring company. That's not what we do. We have 40 to 60 customers. We're doing other things. We're expected to follow our contract.

RP at 1387 (emphasis added).

A jury found CCM Holdings, Inc., Value Village, and Tamera Swager negligent. The jury attributed 70 percent of fault to Swager, 7.5 percent to CCM Holdings, Inc., and

22

22.5 percent to Value Village. The jury did not find Inland Lawn negligent. The jury found the Swagers' damages to be $684,961.52. CP 1899, 1942. The trial court entered judgment against CCM Holdings for $52,009.94 and against Value Village for $155,279.42.

After the appeal, CCM Holdings and Value Village respectively paid the judgments. Tamera and Marty Swager then released the two defendants.

## LAW AND ANALYSIS

Tamera and Marty Swager appeal only the verdict favoring Inland Lawn. They assign four errors. First, the trial court erred in excluding the e-mail messages. Second, the trial court erred in precluding testimony from Lisa Rose. Third, the trial court erred in refusing to deliver the Swagers' proposed jury instruction No. 10. Fourth, the trial court erred when refusing to dismiss the affirmative defense of comparative fault.

We reverse the trial court based on Tamera and Marty Swager's second assignment of error. Nonetheless, we address the other three assignments since the issues presented by the assignments may reappear during a retrial.

On appeal, Inland Lawn asks this reviewing court to dismiss Tamera and Marty Swagers' action as a matter of law on the doctrine of implied primary assumption of risk. Inland Lawn argues that Swager assumed the risk of the fall because she saw the icy conditions on the lot and this assumption of risk presents a complete defense.

23

We decline to address this request for judgment as a matter of law for two reasons. First, Inland Lawn did not seek dismissal before the superior court on this defense. We decline to address an argument raised for the first time on appeal. RAP 2.5(a); *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 671 n.2, 230 P.3d 583 (2010); *Eyman v. McGehee*, 173 Wn. App. 684, 698, 294 P.3d 847 (2013). Second, Inland Lawn did not cross appeal a denial of judgment as a matter of law. The failure to cross appeal an issue generally precludes its review on appeal. *Tellevik v. 31641 W. Rutherford St.*, 120 Wn.2d 68, 89, 838 P.2d 111 (1992). Because it did not cross appeal, Inland Lawn assigned no error to any refusal to take the question of its liability from the jury.

We reverse and remand for a new trial the claim against Inland Lawn because of evidentiary error. The new trial will lack the presence of the other two defendants. In the latter part of this opinion, we examine the issues to be resolved by the second jury.

Exclusion of Defendants' E-mails

We first address the assignment of error based on the trial court's exclusion from evidence e-mail containing concessions from two defendants of ice on the parking lot and steps taken after Tamera Swager's spill. Tamera and Marty Swager claim that the e-mail messages constitute admissions that ice, including ice under snow, covered the parking lot and deicer was not working at the time of Swager's spill. In so contending, the Swagers focus on the January 4 e-mail message from Value Village Risk Manager Sheri Blankinship to Value Village Facilities Manager Darren Farwell and the January 17 e-

24

mail from CCM Holdings agent Shelley Martinez to insurance agent Tom Siebert. The Swagers argue that the e-mails fall under the hearsay exception found in ER 801(d)(2), admission by party-opponent. We note that Value Village, CCM Holdings, and Inland Lawn recognized at trial the existence of ice on the lot. The defendants emphasized the presence of ice when arguing Swager was comparatively at fault. We also observe that the Swagers never expressly sought introduction of Ex. P109 to show the presence of ice in the parking lot or the worthlessness of the deicer. The Swagers emphasized that the e-mail proved that CCM Holdings held control over the parking lot.

Despite the lack of a need to prove the point asserted by the Swagers, we would likely allow into evidence a portion of the e-mail message that admitted the presence of ice. Nevertheless, the Swagers never contoured Ex. P109 to limit the entries to those sections admissible. Nor did the Swagers offer to excise any words from any of the discrete e-mails found in Ex. P109. For the first time on appeal, the Swagers contend the trial court could have excluded references to insurance and remedial measures without excluding crucial admissions. During trial, the Swagers never asked the trial court to admit only those portions that might be admissible.

We decline to address the merits of the Swagers' assignment of error with regard to Exhibit 109 for two related reasons. First, the Swagers waived the right to entry of excised portions of exhibit. We do not address an argument asserted for the first time on appeal. RAP 2.5(a); *Kanam v. Kmet*, 21 Wn. App. 2d 902, 913, 508 P.3d 1071(2022).

25

Second, the trial court lacked any duty to separate the admissible from the inadmissible on its own initiative. *Bell v. O'Connor Transportation Ltd.*, 94 Idaho 406, 408, 489 P.2d 439 (1971), *overruled on other grounds by Owen v. Burcham*, 100 Idaho 441, 599 P.2d 1012 (1979). Reviewing courts usually apply this rule to circumstances when the appellant complains that the trial court admitted the exhibit without excising inadmissible sections. Legal logic compels the same conclusion when the appellant faults the trial court for failing to excise inadmissible portions.

## Exclusion of Expert Witness

Tamera and Marty Swager next contend that the trial court erred when excluding testimony from snow and ice removal expert Lisa Rose. According to the Swagers, the trial court erred because Rose could have helped the jury understand the nature of the snow removal industry and learn the steps that a reasonable snow removal contractor would undertake under the circumstances. In so doing, the trial court employed the wrong legal standard under ER 702. This assignment of error poses the appeal's most difficult question.

Inland Lawn, in its brief, repeats at length the trial court's evidentiary ruling but provides no autonomous analysis as to the admissibility of Lisa Rose's opinions finding fault against it. Inland Lawn instead summarily argues that the trial court holds wide discretion and that it did not abuse its discretion. The snow removal contractor's failure to independently assay admissibility impedes our ability to rule in its favor.

We will not repeat verbatim the lengthy comments of the trial court preceding its exclusion of Lisa Rose's opinions. We applaud the trial court's thorough and astute analysis of Rose's testimony, which analysis witheringly identified flaws in Rose's opinions and her method of arriving at the opinions. Nevertheless, we conclude that the trial court's scrutiny of the testimony bears on the believability of the opinions, not on the admissibility of the opinions.

We dissect the trial court's extensive comments and list the possible rationales behind the court's order of exclusion.

1. Lisa Rose had not visited the site and lacked knowledge of the site's grade, shape, or square footage.

2. Rose did not disclose whether she knew about the physics of snow and ice, the nature of magnesium chloride, and the temperatures at which a deicer works.

3. Rose is part of an organization attempting to market itself as creating higher standards.

4. Rose adopted the standard of care in a quest to professionalize the snow removal industry.

5. Rose could not identify any contractor in Spokane who belonged to her organization.

6. Rose never mentioned that her proposed standard was a widely used standard.

7. Rose did not identify any contractor in Spokane who followed the standard.

8. Rose conceded that no government entity had adopted her recommended standard.

9. Rose never explicitly opined that a hazardous condition existed on the parking lot on January 4.

10. Rose did not expressly aver that a return to monitor the parking lot was needed to create a safe condition for people traversing the lot.

11. Rose's opinion sought to allocate liability for falls among the snow removal contractor, the store, and the property owner when Washington law already performed this task.

12. Rose's suggested standards did not relate to safety.

13. Rose never identified any data, scientific studies, or technical research she had performed.

14. Rose did not ground her opinion on technical information or her experience.

15. Scientific, technical, or other specialized knowledge is not necessary for the trier of fact to understand the evidence presented or to determine the fault of Inland Lawn.

16. Rose lacked an ability to explain scientific facts or technical knowledge about snowplowing, snow removal, ice removal, and ice treatment.

17. The purpose of the proposed standard is to enable the snow removal contractor to charge more for services.

18. The offered standard would impose undue costs on the contractor or property owner.

19. Rose did not testify that her recommended standard would reduce accidents.

20. Lisa Rose presented no technical, scientific or other specialized knowledge that showed her proposed standard would have prevented Tamera Swager's fall.

The superior court may not have based its decisions on some of the twenty rationales and instead only commented on some of them in passing. Many of the twenty rationales for the evidentiary ruling overlap. Some may extend beyond the purported ruling that the testimony would not aid the trier of fact. For example, some of the comments suggest that the court rejected Lisa Rose as a qualified expert, despite commenting to the contrary. Rationale 16 hints that Rose may have expertise in snow and ice removal, but may not be an effective communicator. Some rationales spill over into Rose's opinions regarding fault on the part of the property owner. Rationales 19 and 20 addressed causation rather than fault of Inland Lawn.

Tamera and Marty Swager suggest that the trial court concluded that no expert, no matter the qualifications and confirmation of her opinions by studies or research, should testify to standards of snow removal. We do not read the court's comments this way.

This court reviews a trial court's decision to exclude an expert witness' testimony for abuse of discretion. *Driggs v. Howlett*, 193 Wn. App. 875, 896, 371 P.3d 61 (2016). Discretion is abused if it is exercised on untenable grounds or for untenable reasons. *Driggs v. Howlett*, 193 Wn. App. 875, 897 (2016). A trial court's decision is based on untenable grounds and requires reversal if reached by applying the wrong legal standard, by relying on unsupported facts, or by adopting a view that no reasonable person would

take.  *Hoffman v. Kittitas County*, 4 Wn. App. 2d 489, 495, 422 P.3d 466 (2018); *Driggs v. Howlett*, 193 Wn. App. 875, 897 (2016).  With this standard of review, we analyze the facts and legal standards on which the trial court based its ruling of exclusion.

Under ER 702:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Expert testimony is typically admissible if:

(1) the expert is qualified,
(2) the expert relies on generally accepted theories in the scientific community, and
(3) the testimony would be helpful to the trier of fact.

*Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014).

The trial court faulted Lisa Rose for not having performed scientific tests or garner data from studies to bolster the standard of care she proposed.  We note, however, despite the three-part test of admissibility found in Johnston Forbes referencing theories in the scientific community, practical experience is sufficient to qualify a witness as an expert. *State v. Yates*, 161 Wn.2d 714, 765, 168 P.3d 359 (2007), *abrogated by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018).  One may serve as an expert witness based on observations on the particular subject alone.  *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 851 (Ala. 2002).  An expert may testify based solely on experience without referencing industry literature.  *Primiano v. Cook*, 598 F.3d 558, 566 (9th Cir. 2010).

In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *Siring v. Oregon State Board of Higher Education ex rel. Eastern Oregon University*, 927 F. Supp. 2d 1069, 1074-76 (D. Or. 2013). Assessing the reliability of expert testimony based on specialized knowledge, unlike scientific or technical expert testimony, is not contingent upon a particular methodology or technical framework. *Hangarter v. Provident Life and Accident Insurance Co.*, 373 F.3d 998, 1018 (9th Cir. 2004).

The trial court primarily excluded Lisa Rose's testimony on the basis that her opinions did not assist the jury in reaching a verdict. Expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading. *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004); *Driggs v. Howlett*, 193 Wn. App. 875, 905 (2016); *Miller v. Likins*, 109 Wn. App. 140, 147-48, 34 P.3d 835 (2001).

On the one hand, if the issue involves a matter of common knowledge about which inexperienced persons are capable of forming a correct judgment, there is no need for expert opinion. *State v. Smissaert*, 41 Wn. App. 813, 815, 706 P.2d 647 (1985). On the other hand, the law does not require that expert testimony be completely beyond the jury's sphere of knowledge. *In re Japanese Electronic Products Antitrust Litigation*, 723

31

F.2d 238, 279 (3d Cir. 1973), *rev'd on other grounds sub nom. Matsushita Electronic*

*Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538

(1986). An expert witness may provide helpful testimony even though some jurors

possess general knowledge of the subject matter. *People v. Lindberg*, 45 Cal. 4th 1, 190

P.3d 664, 698, 82 Cal. Rptr. 3d 323 (2008). Despite jurors being equipped to render

judgments on the basis of their common knowledge and experience, experts may have

specialized knowledge to bring to the issue which would be helpful. *United States v.*

*Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996); *In re Japanese Electronic Products Antitrust*

*Litigation*, 723 F.2d 238, 279 (3d Cir. 1983), *rev'd on other grounds sub nom.*

*Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct.

1348, 89 L. Ed. 2d 538 (1986). No bright line separates issues within the comprehension

of jurors from those that are not. *In re Japanese Electronic Products Antitrust Litigation*,

723 F.2d 238, 279 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Electronic*

*Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538

(1986). In *People v. Lindberg*, a prosecution for a hate murder, the court allowed an

expert witness to testify that the defendant was a White supremacist even though some

jurors held knowledge of the subject matter.

We expect that most jurors have engaged in shoveling snow. But we also expect

the common juror to lack a background in the snow removal industry or removing snow

from large parking lots. Presumably the average juror does not know about the thaw and

refreeze phenomenon attended to deicer. The jury would not know how often a contractor or property manager should inspect the lot. The jury did not know the importance of allocating the responsibility to monitor the lot for changing and dangerous conditions. Thus, we conclude that the jury could render a more informed decision as to the standard of care when performing snow removal with Lisa Rose's testimony.

Although Lisa Rose may not be a chemist with understanding of magnesium chloride, she possessed years of experience in the snow removal industry. She must have known about the nature of deicer and its failure to perform as time passed. Kelly Peterson, Inland Lawn's part owner and manager, testified to refreezes after the use of deicer one to two days later.

Thus, Inland Lawn's witness testified based on his expertise, rather than a degree in chemistry, as to the nature of deicer. Lisa Rose should have been able to rebut or confirm Kelly Peterson's testimony. During her voir dire, Rose averred that magnesium chloride on the parking lot would have undergone melting and later refreezing. Rose's testimony that Inland Lawn should have monitored the lot thereafter or at least reached an agreement with Value Village or the property owner about who would monitor the lot after an instance of snow removal would coincide with testimony about deicer.

Inland Lawn's Kelly Peterson also testified at trial that he did not know what occurred after the deicer waned in effect. Lisa Rose could have enlightened the jury on this question.

33

During his testimony, Kelly Peterson agreed someone should monitor the parking lot after Inland Lawn's work, but denied that the party responsible should be the snow removal contractor. This testimony bolsters Lisa Rose's testimony of the need to monitor. More importantly, Rose should have been able to contradict Peterson's testimony that the contractor is never the party responsible for monitoring. Since Inland Lawn's own manager declared a need for monitoring and none of the witnesses on behalf of any defendant testified to the assignment of this duty, the jury needed to hear from Rose as to the need of the property manager and the snow removal contractor to discuss and assign this responsibility to one party.

An example close to home entails the provision of services by an estate planning attorney when an accountant and financial adviser also assists the client in such planning. The attorney may expect one of the other two professionals to perform a task, such as research the tax consequences of a provision in a will, whereas the other two professionals may expect the attorney to perform the task. The task is never completed to the harm of the client. If and when the client sues the attorney for malpractice, we would anticipate the admissibility of an expert witness to testify that the attorney violated the standard of care by failing to discuss and resolve with the accountant and financial adviser the identity of the person who would research the tax consequences. The expert attorney could primarily rely on his years of experience as estate planning attorney rather

than a published standard of care or a study performed by practitioners about harm caused to clients.

The trial court faulted Lisa Rose for not having been to the site. We also note that Rose, during the offer of proof, never expounded on the detailed conditions present in the parking lot such as was testified to by Scott Mankin. We also recognize that the expert's opinion must possess a factual basis. *Maurice v. Chester Housing Associates Limited Partnership*, 189 Conn. App. 754, 208 A.3d 691 (2019). Still, unless the judge requires otherwise, the expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data. ER 705. The opposing party may cross examine the expert thereafter. ER 705. Regardless, Rose based her opinion on the facts of the snow storms on January 1, the snow removal and application of deicer on January 1, the failure to monitor the parking lot thereafter, and slick conditions on the parking lot on January 4. These facts suffice for the opinions she reached.

An expert may base her opinion testimony on her belief or idea rather than on direct knowledge of the facts presented in the case. *State v. Demery*, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001); *State v. Sutherby*, 138 Wn. App. 609, 617, 158 P.3d 91 (2007), *aff'd on other grounds*, 165 Wn.2d 870, 204 P.3d 916 (2009). The expert need not have spoken to the plaintiff. *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010).

We assume that an expert who testifies to the negligence of one engaged in a profession must identify a standard of care accepted in the industry. *Novak v. Capital Management & Development Corp.*, 386 U.S. App. D.C. 395, 570 F.3d 305, (2009). We conclude that Lisa Rose met this requirement. She testified to a publication that she assisted in editing that the industry considers as its Bible. She based her opinions on standards and protocols outlined in the publication.

The trial court faulted Lisa Rose for failing to know whether any snow removal contractor in Spokane followed the standards published in the industry Bible. Nevertheless, Rose avowed that the standards that apply to Erie, Pennsylvania also apply to Spokane. Inland Lawn cites to no cases that require an industry national expert to identify local practitioners who follow the industry standards.

No Washington decision addresses the admissibility of expert testimony with regard to snow and ice removal. A handful of foreign decisions address this topic in the context of a slip and fall on icy premises.

Most of the decisions cover the qualifications, or lack thereof, of the purported expert in snow removal. In *Maurice v. Chester Housing Associates Limited Partnership*, 189 Conn. App. 754, 208 A.3d 691 (2019), the reviewing court affirmed the trial court's refusal to allow Dee Ann Maurice's expert to testify as an expert in the field of snow removal. The expert's field was building code enforcement. He had plowed snow as a young man. On questioning, the expert did not disclose that he had been to school or

attended seminars on snow removal or read books or educational materials on snow removal.

In *Spencer v. Wal-Mart Stores East, L.P.*, 930 A.2d 881 (Del. 2007), the state Supreme Court affirmed the exclusion of an architect from testifying about snow removal. The architect had no experience in snow removal and formed his opinion by pulling phrases and sentences from snow plowing and safety publications. He was not a member in any professional organization in the field of snow and ice removal. His only experience was helping his father with snow plowing as a teenager.

In *Tucker v. Bensalem Township School District*, 987 A.2d 198 (Pa. Commw. Ct. 2009), the reviewing court affirmed that trial court's exclusion of an architect who Janet Tucker sought to testify that the school district had been negligent in failing to take corrective action to prevent ice from forming in the parking lot or taking measures to treat the ice with chemicals.

The lack of qualifications of the experts in *Maurice v. Chester Housing Associates*, *Spencer v. Wal-Mart Stores East*, and *Tucker v. Bensalem Township School District*, when compared to the qualifications of Lisa Rose, highlight how Rose's opinions would be helpful to a jury and were not based on her personal predilections, but on experience. Rose worked in the snow removal industry for decades. She was a member of snow and ice professional organizations. To repeat, she helped to edit the Bible of snow removal.

37

In *Tucker v. Bensalem Township School District*, the reviewing court also excluded the architect's testimony in part because the court deemed snow and ice removal from a parking lot to be within the common knowledge and experience of a lay person. We wonder how judges are able to determine what the common juror knows and does not know. Our experience conflicts with the conclusions of the Pennsylvania court because the details of the removal and the employment of deicer are not always known to jurors.

To repeat, Lisa Rose testified to her assistance in the publishing of a book on snow removal. One factor when considering whether to permit an expert's opinion is the publication of a text. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Hoy v. DRM, Inc.*, 2005 Wy. 76114 P.3d 1268.

In some foreign decisions, the reviewing court approved of the use of a snow and ice expert. In *Tamhane v. Citibank*, N.A., 61 A.D.3d 571, 877 N.Y.S.2d 78 (2009), the appellate court held that the trial court properly denied defendant Citibank's motion to preclude testimony from Ravindra Tamhane's expert. Tamhane slipped on ice at a bank branch. The expert, in response to a summary judgment motion to dismiss, signed an affidavit explaining how ice formed by a thaw-freeze condition whereby snow and ice collected on the roof of the bank building, thawed and dripped on to the ground and refroze. The appellate court reasoned that the expert testimony could be submitted for

the purpose of explaining to the jury the nature of the alleged thaw-freeze condition. The expert opinion would assist the jury in explaining measures that could have been taken to ameliorate the condition.

In *Bowins v. Euclid General Hospital Association*, 20 Ohio App. 3d 29, 484 N.E.2d 203 (1984), the appellate court held that, while the methods and quality of snow removal of small areas are matters well within the general competence of a jury in this vicinity, the techniques for removing snow and ice from a large commercial parking area are not. Therefore, expert testimony which aids the jury in understanding the evidence or in determining the facts in issue should not be excluded. A visitor of a hospital's patient slipped on ice on the hospital grounds.

We now address some of the other twenty rationales we divined from the trial court's ruling. The trial court criticized Lisa Rose's testimony in part because she never declared that employment of her standard of care would have prevented the fall of Tamera Swager. But we know of no rule that requires an expert, who testifies to liability or the standard of care, to also provide an opinion on causation. In a medical malpractice suit, an expert must testify to causation, but that expert need not be the same as the expert who testifies to liability. Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible. *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

The trial court, based on several facts, lessened the credibility of Lisa Rose because of a pecuniary interest in promulgating standards. Nevertheless, financial interest in the testimony does not form a basis for exclusion of the evidence from the jury. An expert witness's pecuniary interest in the outcome of a case goes to the probative weight of testimony, not its admissibility. *Cruz-Vazquez v. Mennonite General Hospital, Inc.*, 613 F.3d 54, 59 (1st Cir. 2010); *Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d 49, 58 (1st Cir. 1996). An expert may render an opinion based on his many years in a business despite the opinion advancing his economic interests. *Merritt v. Dueitt*, 455 So.2d 792, 792-93 (Miss. 1984). The opponent may instead attack his credibility on cross-examination. *Merritt v. Dueitt*, 455 So.2d 792, 792-93 (Miss. 1984).

The trial court excluded Lisa Rose's testimony in part because no government entity had adopted her standard. Nevertheless, the law does not require the imprimatur of a standard of care proposed by the proponent. An expert may testify that the defendant violated a standard of care even if the defendant complied with government standards. *Minner v. Am. Mortgage & Guar. Co.*, 791 A.2d 826, 866 (Del. Super. Ct. 2000).

The trial court excluded Lisa Rose's opinions in part because Washington law purportedly already allocated liability for falls among the snow removal contractor, the store, and the property owner. On appeal, Inland Lawn cites no Washington statute or decision that allocates the risk between the various actors.

40

The trial court may have criticized Lisa Rose for her failure to adequately explain her opinions. Nevertheless, Inland Lawn cites no rule that requires an expert to be an effective communicator.

We recognize that the standard proposed by Lisa Rose could impose monetary losses on the snow removal industry. Nevertheless, Inland Lawn can argue to the jury the unfairness of Rose's proposed standard and its burden on contractors. Snow removal contractors can fight the costs by raising rates based on higher insurance premiums resulting from such a standard. The legislature may also fix any harmful repercussions to the snow removal industry.

We add some additional principles of laws as we end our analysis. The expert's testimony need not be conclusively reliable or indisputably valid before admitted into evidence. *State v. Corriher*, 184 N.C. App. 168, 645 S.E.2d 413 (2007). Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). When a proponent establishes the baseline foundation of an opinion, sifting through the contradictory evidence is a task reserved for the jury. *Hale County A&M Transport. LLC v. City of Kansas City, Mo.*, 998 F. Supp. 2d 838, 845 (W.D. Mo. 2014).

Tamera Swager's counsel could have laid a firmer foundation by asking Lisa Rose to assume certain facts, asking her to opine on those facts, and questioning her as to the

acceptance of the standard in the snow removal industry. Rose also did not assist the Swagers' offer of proof when failing to directly answer some of counsel's and the trial court's questions. But information could have been developed by further testimony and was not essential to the admission of the opinions. Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility. *Robinson v. GEICO General Insurance Co.*, 447 F.3d 1096, 1100-01 (8th Cir. 2006); *Lauria v. National Railroad Passenger Corp.*, 145 F.3d 593, 598 (3d Cir. 1998).

We recognize that we should defer to the superior court. We should reverse, however, when the trial court's ruling conflicts with many principles of law despite the diligent work of, and our respect for, the trial court. Defects in Lisa Rose's testimony impacted its credibility, not admissibility.

Tamera and Marty Swager argue that excluding Lisa Rose was prejudicial to the outcome of the case. When a trial court makes an erroneous evidentiary ruling, the question on appeal becomes whether the error was prejudicial, for error without prejudice is not grounds for reversal. *Driggs v. Howlett*, 193 Wn. App. 875, 903 (2016). An erroneous evidentiary ruling is one made based on a trial court's application of the wrong legal standard. *Aubin v. Barton*, 123 Wn. App. 592, 610, 98 P.3d 126 (2004); *Driggs v. Howlett*, 193 Wn. App. 875, 897 (2016); *Hoffman v. Kittitas County*, 4 Wn. App. 2d 489, 495 (2018).

The case against Inland Lawn hinged on whether the snow removal contractor performed to the standard of care expected of a contractor. The trial court's exclusion of the plaintiff's only expert on this subject must have been prejudicial. The court's ruling particularly harmed Tamera and Marty Swager when Inland Lawn's witnesses testified to its practices of snow removal and that its practices were acceptable. Inland Lawn's closing argument unfairly took advantage of the exclusion of Lisa Rose's testimony when its counsel intoned that the company's operations manager Kodi Bilbrey should be considered an expert on snow removal, that Inland Lawn performed adequately, and that no one on behalf of the Swagers testified that Inland Lawn performed negligently.

Jury Instruction

Tamera and Marty Swager next assign error to the superior court's failure to deliver a jury instruction that delineated a snow removal contractor's duty to exercise care during snow and ice removal from a parking lot. Determining whether to give a certain jury instruction is within a trial court's discretion, so such decisions are reviewed for abuse of discretion. *Fergen v. Sestero*, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). Under this standard, we will reverse a trial court's decision only if the decision applies the wrong legal standard, relies on unsupported facts, or adopts a view that no reasonable person would take. *Hoffman v. Kittitas County*, 4 Wn. App. 2d 489, 495 (2018). The controlling rule for this appeal is the trial court's refusal of a requested instruction is

reversible error only when the instruction is a correct statement of law. *Izett v. Walker*, 67 Wn.2d 903, 908, 410 P.2d 802 (1966).

At trial, Tamera and Marty Swager used the text of *Restatement (Second) of Torts* § 383 (AM. L. INST. 1965) as their proposed jury instruction 10 on a contractor's duty to invitees:

> [o]ne who does an act or carries on an activity upon land on behalf of the possessor is subject to the same liability, and enjoys the same freedom from liability, for physical harm caused thereby to others upon and outside of the land as though he were the possessor of the land.

CP at 1230. We juxtapose § 383 with § 384 of *Restatement (Second) of Torts*. At trial, Inland Lawn contended that § 384 controlled its standard of care. The latter *Restatement* section reads:

> One who on behalf of the possessor of land erects a structure or creates any other condition on the land is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside of the land by the dangerous character of the structure or other condition while the work is in his charge.

CP at 611. We conclude that neither § 383, nor § 384, controls the facts of this case.

Tamera Swager complains about deicer being applied, the deicer thawing the snow, and ice reforming after the passage of time. Inland Lawn's instrumentalities did not directly strike Swager. Instead, Inland Lawn's work created a condition on the land. Therefore, § 383 did not govern Inland Lawn's standard of care.

44

The Swagers argue that § 383 governs their claim against Inland Lawn based on *Williamson v. Allied Group, Inc.*, 117 Wn. App. 451 (2003). The Swagers argue that this court in *Williamson* relied on the text of § 383 when holding that the contractor owed a tenant the same duty as the one owed by the landlord to the tenant. The Swagers fail to recognize that, although this court noted in *Williamson* that § 383 outlines the general rule that "the duty owed by a landlord may also be owed derivatively by a person who acts on behalf of the landlord," this court allocated liability to the contractor by relying not on § 383, but on § 384. *Williamson v. Allied Group, Inc.*, 117 Wn. App. 451, 456 (2003).

Section 384 applies only while the contractor remains in charge of the work. By the time of Tamera Swager's fall, Inland Lawn was actively performing no snow removal services at Value Village.

Dismissal of Comparative Fault Defense

Tamera and Marty Swager contend that the superior court committed error when refusing to grant their motion to dismiss the affirmative defense of comparative fault. They argue that the defendants failed to produce any evidence supporting the defense. Inland Lawn responds that substantial evidence supported the inference that Swager's contributory negligence played a role in causing the injuries she sustained. This court reviews de novo a trial court's decision to deny a motion for a judgment as a matter of law. *Budd v. Kaiser Gypsum Co., Inc.*, 21 Wn. App. 2d 56, 72, 505 P.3d 120 (2022).

45

A trial court appropriately denies a motion for judgment as a matter of law if, viewing the evidence most favorably to the nonmoving party, substantial evidence sustains a verdict for the nonmoving party. *Bishop of Victoria Corporation Sole v. Corporate Business Park, LLC*, 138 Wn. App. 443, 453, 158 P.3d 1183 (2007). Evidence is substantial to support a verdict if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise. *Bishop of Victoria Corporation Sole v. Corporate Business Park, LLC*, 138 Wn. App. 443, 454 (2007).

A claimant is comparatively at fault or contributorily negligent when she fails to exercise the reasonable care for her own safety that a reasonable person would have used under the existing facts and circumstances and her conduct legally contributed to her injury. *Heinlen v. Martin Miller Orchards*, 40 Wn.2d 356, 360, 242 P.2d 1054 (1952). A claimant also holds comparative fault when unreasonably assuming a risk or unreasonably failing to avoid an injury. RCW 4.22.015.

During trial, the defendants did not call any witnesses to the stand to directly declare that Tamera Swager acted unreasonably or failed to exercise due care when traversing the Value Village parking lot. Nevertheless, testimony given by Swager and Scott Mankin sufficed to create a question of fact as to comparative fault. Swager testified that she had experienced Spokane winters before, had previously walked on ice, and observed compact snow and ice in Value Village's parking lot before entering it. She failed to look down once she entered the lot. Mankin averred that he readily saw ice in

46

the parking lot when he traveled to Value Village to pick up the Swagers, that the icy condition of the parking lot was open and obvious, and that the ice was "very slick" when he walked on it. In addition to a reasonable jury being able to conclude that Swager did not exercise proper care when proceeding to walk across the parking lot, a reasonable jury could conclude that she acted unreasonably by failing to tell her husband to walk beside her so that she could clutch his arm.

Reported decisions narrate varying circumstances, including differences in the size of ice on a walkway and the open nature of the ice. Nevertheless, many cases hold that the fault of the plaintiff when slipping on ice constitutes a question for a jury. *Carter v. Bullitt Host, LLC*, 471 S.W.3d 288 (Ky. 2015); *Gibbs v. Speedway, LLC*, 2014 – Ohio – 3055, 15 N.E.3d 444; *Dukat v. Leiserv, Inc.*, 6 Neb. App. 905, 578 N.W.2d 486 (1998); *McCabe v. Easter*, 128 A.D.2d 257, 516 N.Y.S.2d 515 (1987); *Rossow v. Jones*, 404 N.E.2d 12 (Ind. Ct. App. 1980).

Allocation of Fault on Retrial

We are directing a new trial because of evidentiary error. Parties in the previous trial included not only the parties on appeal, Tamera and Marty Swager and Inland Lawn, but also two other defendants: CCM Holdings and Value Village. The Swagers did not appeal the partial verdicts favoring them against CCM Holdings and Value Village that also reduced their recovery because of substantial comparative fault. After the trial,

Swager settled with both CCM Holdings and Value Village. As a result, the retrial will change significantly. CCM Holdings and Value Village will occupy empty chairs.

As a result of the vacant chairs and the release of CCM Holdings and Value Village, this court posed five overlapping questions for the parties to answer. In answering the questions, the parties were to assume that the court concluded that substantial evidence sustained the previous jury's finding of comparative fault of Tamera Swager and the court reversed the trial court because of evidentiary error. The parties responded to these questions:

> 1. Are appellants bound by the earlier jury's allocation of fault to Tamera Swager?

> 2. How does the jury allocate fault among Tamera Swager and Inland Lawn when the previous jury never included any fault on the part of Inland Lawn in the calculation of fault among the parties?

> 3. May the jury allocate to Inland Lawn a portion of fault that was allocated to Value Village and CCM Holdings in the earlier verdict?

> 4. Conversely, are appellants limited to only transferring some of Tamera Swager's allocated fault to Inland Lawn?

> 5. Do appellants receive a new trial on damages?

Letter from Court Clerk Tristen Worthen, Division III of the Washington State Court of Appeals, No. 38438-1-III (Feb. 2, 2023). We now proceed to answer the questions. We address liability and allocation of fault first, before whether either party receives a new trial on damages.

Tamera and Marty Swager maintain that, on retrial, the jury must decide anew whether the two nonparticipating defendants bear any fault and, if so, the jury must assess the portion of fault to assign to each of them. The Swagers also argue that they are not bound by the prior jury's finding of seventy percent fault against Swager. Conceivably, under the Swagers' position, the new jury could hold Inland Lawn one hundred percent responsible for all of Swager's damages. The Swagers also seek a new trial on damages.

Inland Lawn contends that the Swagers are bound by the first jury's finding of seventy percent fault on Tamera Swager. Conversely, according to Inland Lawn, the second jury may only allocate to it the remaining thirty percent of blame imposed by the first jury on CCM Holdings and Value Village. Inland Lawn, in turn, argues that the Swagers are bound by the first jury's assessment of damages. Therefore, since the other two defendants already paid thirty percent of the Swagers' damages, the Swagers have been paid in full. According to Inland Lawn, allocating some of the thirty percent of fault to it accomplishes nothing such that we should dismiss the Swagers' appeal. Inland Lawn never forwarded this contention until we asked the parties to assume we would reverse based on evidentiary error. We consider each side's position extreme and fashion a resolution in between the two zealous stances. We hold that the Swagers are bound by the former jury's finding of fault on Tamera Swager. We also hold that the Swagers are bound by the jury's findings of negligence of Value Village, but not CCM Holdings. We will explain later why we differentiate between Value Village and CCM Holdings. The

49

Swagers, however, are not bound by the allocation of fault among the three parties as measured by the jury. We direct the trial court to instruct the second jury that Swager and Value Village are both at fault. The trial court will then direct the jury to respectively determine if CCM Holdings and Inland Lawn were negligent. If the second jury finds Inland Lawn negligent, it will need to allocate fault among the four parties without any knowledge of the first jury's allotment of fault. Finally, we hold that the Swagers are bound by the first jury's award of damages. Because Inland Lawn is entitled to a credit for the sums paid by CCM Holdings and Value Village, Inland Lawn need not pay any amount to the Swagers unless the jury allocates in the aggregate to CCM Holdings, Value Village, and Inland Lawn more than thirty percent of the fault to Inland Lawn.

Some Washington decisions promote a presumption in favor of a new trial on all issues. *Bauman v. Complita*, 66 Wn.2d 496, 502, 403 P.2d 347 (1965); *Walker v. State*, 67 Wn. App. 611, 622, 837 P.2d 1023 (1992), *rev'd on other grounds*, 121 Wn.2d 214, 848 P.2d 721 (1993). Other decisions recognize the waste of setting aside a verdict in total when the issues determined by the jury are severable and when no harm will result from retaining the verdict and judgment on those issues not affected. *Cramer v. Bock*, 21 Wn.2d 13, 16, 149 P.2d 525 (1944). Decisions multifariously enunciate a principle emanating from this policy promoting conservation of resources. A new trial may be limited to certain issues when other issues were distinct and justice does not require

resubmission of the entire case to the jury. *Mina v. Boise Cascade Corp.*, 104 Wn.2d 696, 707, 710 P.2d 184 (1985); *McCurdy v. Union Pacific Railroad*, 68 Wn.2d 457, 413 P.2d 617 (1966); *Mutual of Enumclaw Insurance Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 727, 315 P.3d 1143 (2013). The court may limit the new trial to the issues affected by the error whenever those issues are entirely distinct and separable from the matters involved in other issues and the trial can be had without danger of complication with other matters. *Cramer v. Bock*, 21 Wn.2d 13, 16-17 (1944). Conversely, when error touches one part of a jury ruling, retrial is required on all other issues "inseparably connected" to the tainted issue. *Brundridge v. Fluor Federal Services, Inc.*, 164 Wn.2d 432, 457, 191 P.3d 879 (2008); *Myers v. Smith*, 51 Wn.2d 700, 705-07, 321 P.2d 551 (1958).

Our decision not only requires the articulation of the guiding principle behind limiting the scope of new trials but also an examination and synthesis of Washington decisions. We review the cases in chronological order beginning with the oldest.

*Cramer v. Bock*, 21 Wn.2d 13 (1944) favors a new trial on all issues. At a time when contributory negligence acted as a complete bar to recovery, Eleanor Cramer sued for damages to her automobile sustained in a collision with an automobile driven by Emma Bock. Bock cross claimed against Cramer for damages to her car and alleged that Cramer's negligence caused the collision. The jury returned a verdict for Bock without awarding her damages. The jury did not disclose whether it ruled against Cramer

because of contributory negligence or because Bock was not negligent. On its own, the trial court granted a new trial on the basis of instructional error. The trial court dismissed, however, Bock's counterclaim. Bock appealed both the grant of the new trial and dismissal of her cross complaint. The Supreme Court agreed that the trial court erred when delivering a jury instruction on the deception of the disfavored driver doctrine when Brock never testified that the driving of Cramer deceived her. The Supreme Court affirmed the order for a new trial. The court also agreed with a new trial on both the complaint and counterclaim because it could not ascertain the reason why the jury ruled against Cramer.

*Bauman v. Complita*, 66 Wn.2d 496 (1965) entailed a controlled intersection collision. The wife of the favored driver, Irwin Bauman, obtained a jury verdict against the disfavored driver. The wife was a passenger in her husband's car. The Supreme Court held that the trial court erred when withdrawing the issue of Irwin Bauman's contributory negligence from the jury. Although defendant Louis Complita did not stop at the stop light, Irwin Bauman may have been able to avoid the collision. Bauman often drove the route and knew that many trucks did not stop at the light because of a dip in the road. Bauman asked that the retrial be limited to the issue of contributory negligence. The Supreme Court disagreed because of a question of fact as to whether Complita was liable. Some evidence suggested he entered the intersection on an amber light, while other evidence suggested he entered on a red light.

In *Lahmann v. Sisters of St. Francis of Philadelphia*, 55 Wn. App. 716, 780 P.2d 868 (1989), Peter Lahmann died of a pulmonary embolism while a patient at St. Joseph Hospital. His widow, Patricia Jean Lahmann, sued St. Joseph Hospital. In a special verdict form, the jury answered that St. Joseph Hospital was negligent. The jury, however, deadlocked on whether the hospital's negligence was a proximate cause of Lahmann's death. The trial court declared a mistrial and ordered a new trial on both the issue of negligence and proximate cause. The widow appealed and argued that the new trial should be limited to proximate cause and damages. According to the widow, the hospital should be bound by the first jury's finding of negligence.

In *Lahmann v. Sisters of St. Francis of Philadelphia*, this court affirmed the award of a new trial on negligence and proximate cause. We reasoned that the question of proximate cause could not be resolved without reference to the hospital's negligent acts. Patricia Lahmann contended that the hospital committed many acts and omissions that constituted a breach of duty. Since the answer to the interrogatory in the special verdict did not identify the actions and omissions that the jury found to be negligent, the second jury needed to make that determination again. The first jury may only have found negligence on an act that the second jury found did not cause the death of Lahmann, while the second jury may find another act caused the death but did not form negligence. The issues of negligence and proximate cause were not separable.

*Walker v. State*, 67 Wn. App. 611 (1992) also suggests a liberal rule in favor of a new trial on all issues. Robert Walker perished when his truck plummeted over an embankment. His widow sued the State of Washington, Clallam County, and the Port of Port Angeles for negligent design, construction, and maintenance of the highway. The jury found negligence on the part of all three defendants, but also found Walker seventy percent at fault. On appeal, this court agreed with the widow's challenges to evidentiary rulings and jury instructions. The trial court instructed he jury that a motorist must activate headlights after dark despite an absence of evidence that Walker did not use his truck's headlights. The lack of evidence together with a negligence per se jury instruction potentially misled the jury as to the extent of Walker's comparative fault. The trial court also erroneously gave an instruction stating a driver may not pull to the side of the road to allow an overtaking vehicle to pass. This also potentially misled the jury about Walker's fault. The widow asked that the court limit any retrial to the amount of comparative fault of Walker and preclude the defendants from denying fault. This court refused. The court followed the presumption in favor of a new trial on all issues. The issues of defendants' liability and Walker's fault were intertwined so that a jury could not fairly decide one in isolation without danger of injustice to the other.

We now analyze the Washington decisions. If *Bauman v. Complita* was the only relevant Washington Supreme Court decision, we would hold that the jury must decide anew whether Tamera Swager, CCM Holdings, and/or Value Village were to blame for

the slip and fall. But *Bauman v. Complita* appears as an outlier. The Supreme Court did

not explain why Complita should receive a new trial on his negligence, regardless of

conflicting facts, when one jury already found him negligent. The first jury nearly

always faces conflicting facts on an issue, including damages, that this court considers

resolved and withholds from new consideration in a retrial. *Bauman* contradicts

established Washington principles that the court should only submit to the trier of fact

during a retrial those issues infected by some error. *Bauman* conflicts with the

underlying goal of conserving judicial resources and expense to the parties when the

litigants already enjoyed a fair opportunity for a jury to resolve a question.

The Washington Supreme Court decided both *Bauman v. Complita* and *Cramer v.*

*Bock* when contributory negligence was a complete defense. This court wrote in

*Crawford v. Miller*, 18 Wn. App. 151, 154, 566 P.2d 1264 (1977):

> Heretofore, when contributory negligence was a total defense, the
> practice was to grant a retrial of the damage issue when the error concerned
> liability in a close case because of the likelihood of a compromise verdict.
> *Shaw v. Browning*, 59 [Wn.]2d 133, 367 P.2d 17 (1961). It was felt that in
> such a case, the jury fashioned its own comparative negligence rule. V.
> Schwartz, *Comparative Negligence* § 21.1 (1974). That problem has been
> eliminated, it is said, by the adoption of the comparative negligence
> formula, RCW 4.22.010, and use of the special verdict form. Prosser,
> *Comparative Negligence*, 51 Mich.L.Rev. 465 (1953); Haugh, *Comparative*
> *Negligence: A Reform Long Overdue*, 49 Ore.L.Rev. 38 (1969).

We deem the first jury's determination of fault on the part of Tamera Swager

distinct from the question of fault by Inland Lawn. Swager's fault when knowingly

walking on icy conditions bore no relation to Inland Lawn's alleged failure to monitor conditions at Value Village other than Inland Lawn's failure set the stage for the icy conditions. Conversely, Swager's unreasonable conduct did not influence whether Inland Lawn acted negligently. The jury may consider whether Inland Lawn should have known that someone would slip on the ice when assessing Inland Lawn's fault, but not that Swager in particular would eventually fall. The Swagers identify no intermingling nexus between the fault of Inland Lawn and Swager.

We distinguish *Cramer v. Bock* because the purported negligence of the plaintiff and defendant occurred simultaneously, unlike the conduct of Tamera Swager and Inland Lawn. In *Cramer v. Bock* the conduct of the other party influenced whether both the plaintiff and defendant shouldered some of the fault.

The error infecting the first trial concerned the bar of an expert's testimony that Inland Lawn acted unreasonably when failing to monitor conditions at Value Village or failing to discuss with CCM Holdings who should monitor conditions. Expert Lisa Rose expressed no opinions as to the fault of Tamera Swager.

Tamera and Marty Swager already had a full opportunity to litigate the absence of fault on the part of Swager. The jury disagreed.

For the same reason that we rule that the second jury will not decide anew whether Tamera Swager shares some blame for her fall, we hold that the second jury will not decide afresh whether Value Village shares fault. Value Village did not hire Inland

56

Lawn. CCM Holdings hired and dealt directly with Inland Lawn. The fault of Value Village was distinct from the conduct of Inland Lawn. Lisa Rose did not hold any opinions about the fault of Value Village. The Swagers assert no interweaving connection between Value Village's conduct and Inland Lawn's conduct such that the negligence of Inland Lawn might erase or diminish the negligence of Value Village.

We distinguish the question of fault on behalf of CCM Holdings from the question of fault on behalf of Tamera Swager and Value Village. CCM Holdings hired Inland Lawn. Swager's expert Lisa Rose criticized CCM Holdings for not vetting Inland Lawn before hiring it. More importantly, Rose faulted CCM Holdings for failing to clearly outline the duties of Inland Lawn under the snow removal contract. Since Rose faulted both CCM Holdings and Inland Lawn for failing to identify in advance who should monitor conditions, the respective questions of fault for the two defendants are intertwined. Thus, the jury should decide anew any fault on the part of CCM Holdings.

Assuming on remand that the second jury finds fault of Inland Lawn, the jury must allocate the fault of Tamera Swager and Value Village and in possible fault of CCM Holdings among the three or four responsible parties. RCW 4.22.070(1) declares in part:

> In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages. . . . The sum of the percentages of the total fault attributed to at-fault entities shall equal one hundred percent. The entities whose fault shall be determined include the claimant or person suffering personal injury or incurring property damage, defendants, third-party defendants, entities released by the claimant, entities

57

> with any other individual defense against the claimant, and entities immune
> from liability to the claimant. . . . Judgment shall be entered against each
> defendant except those who have been released by the claimant or are
> immune from liability to the claimant or have prevailed on any other
> individual defense against the claimant in an amount which represents that
> party's proportionate share of the claimant's total damages.

No Washington case addresses whether a plaintiff may gain a new trial on the allocation of fault when the jury found the plaintiff partially at fault, one of the defendants partially at fault, and another defendant absent of negligence, but error infected the defense verdict. One foreign decision tangentially addresses this situation. *Kurak v. A.P. Green Refractories Co.*, 298 N.J. Super. 304, 689 A.2d 757 (1997), Charles Kurak, who worked for forty-four years in the presence of asbestos, suffered from mesothelioma. He sued various manufacturers of asbestos. The jury performed the task of allocating responsibility among the manufacturers of the product and imposed five percent of fault on Kurak. The appellate court held that insufficient evidence supported a verdict against one manufacturer. The court directed a new trial, in which the jury would reallocate the fault among other manufacturers. Separate from the lack of evidence for one manufacturer was the problem of a jury question that indicated a strong possibility that the jury considered inflating the damage award as a means of assuring that Kurak and his wife received full recovery of damages despite an allocation of partial fault to Kurak or an allocation of fault to manufacturers who could not pay. The appeals court ruled that the trial court erred when it refused to remind the jury that it was obliged to set

damages without regard to the apportionment of fault. In a murky decision, the New Jersey court, because of the many complicating factors, opted to give Kurak the choice of either accepting the imposition of five percent fault on him or face a new trial on both liability and damages.

In *Kurak v. A.P. Green Refractories Co.*, the court only allowed the plaintiff the option to erase the finding of his five percent fault because of the jury question that wished to grant him a higher award so that his allocated fault did not reduce what he otherwise would receive. More importantly, the court, when dismissing one defendant, ruled that the second jury must reallocate responsibility among all defendants. We agree with the New Jersey court's direction that, on remand, the jury must reallocate fault among all responsible parties. The percentage of fault by Tamera Swager and other responsible defendants obviously intertwine. Thus, we cannot separate the evidentiary error with the allocation of fault among responsible parties.

One might argue that the Swagers are bound by the jury determination of Tamera Swager being seventy percent at fault. In turn, assuming the jury finds Inland Lawn at fault, the jury should only deduct some of the percentage of fault from the other defendants. But no reason exists to distinguish the fault of other defendants from the fault of Swager. The first jury never calculated the fault on the defendants as a team. RCW 4.22.070(1) requires the jury to assess separately the percentage of fault for each responsible party, not the defendants combined and the plaintiff by herself. A finding of

59

liability against Inland Lawn can just as easily decrease the percentage of fault of Swager as CCM Holdings and Value Village.

We recognize that the Swagers, on retrial, lack motivation to assert or submit evidence of negligence on behalf of CCM Holdings and Value Village. Nevertheless, we anticipate that Inland Lawn will submit such testimony. The retrial will not differ from any other trial with an empty chair defendant.

Damages on Retrial

Washington courts have repeatedly ruled that, when the appeal challenged only rulings regarding liability, the parties are bound by the first jury's damages award during any retrial on liability. *Mina v. Boise Cascade Corp.*, 104 Wn.2d 696, 710 P.2d 184 (1985); *France v. Peck*, 71 Wn.2d 592, 599, 430 P.2d 513, 517 (1967); *Nelson v. Fairfield*, 40 Wn.2d 496, 244 P.2d 244 (1952); *Chau v. City of Seattle*, 60 Wn. App. 115, 802 P.2d 822 (1991); *Crawford v. Miller*, 18 Wn. App. 151 (1977). The Washington rule follows the prevailing, if not universal rule, that a full retrial is ordinarily required only when the issues of liability and damages are interwoven. 58 AM. JUR. 2d *New Trial* § 26 (2023).

An anomaly in Washington decisions is *Bauman v. Complita*, 66 Wn.2d 496 (1965). We already discussed the facts of the case and the ruling that directed the second jury to decide the fault of both the Irwin Bauman and Louis Complita. The court surprisingly even granted Complita a new trial on damages. The court wrote:

> Nor should the new trial be limited solely to the issue of liability. The question presented is the converse of that usually presented, of whether the new trial should be limited to the issue of damages. The point is a narrow one, and the cases involving it are few. We recognize that there are situations, especially where the evidence as to damages is largely objective and the extent thereof is not seriously challenged on the appeal, where a new trial could well be limited to the issue of liability. However, in the present case, the details of the injury sustained by the plaintiff-driver and the symptoms thereof are largely subjective and supplies by him. The proof as to liability and as to most of the damages comes from the same source and should be evaluated by the same jury.

*Bauman v. Complita*, 66 Wn.2d 496, 502 (1965).

Once again, we consider *Bauman v. Complita* to be an outlying decision. In all personal injury cases, the claimant seeks subjective damages. In all personal injury cases, the claimant's injuries arise from the defendant's conduct that relates to liability. If one followed the quoted passage from *Bauman*, the retrial would always submit the question of damages to the second jury.

Twenty years after *Bauman v. Complita*, the Washington Supreme Court decided *Mina v. Boise Cascade Corp.*, 104 Wn.2d 696 (1985). *Mina* entailed a multiple car accident in a cloud of fog on the familiar and undulating stretch of Interstate 82 between Yakima and Ellensburg. The jury found defendant Hofstrand Logging negligent, but also found plaintiff Ezzat Mina eighty-five percent at fault. The Court of Appeals reversed because of an erroneous instruction that informed the jury that a driver possessed a duty not to park on the roadway. Mina's car stalled in a lane of traffic after being struck.

Hofstrand Logging Company, before the Supreme Court, also argued that, because of the remand for a new trial, the second jury should also again decide damages in addition to the fault of the parties. The Supreme Court disagreed because the trial court had properly instructed the jury on damages and the verdict form separated damages from liability. On appeal, neither party asserted that the award of damages was excessive or insufficient. *Mina v. Boise Cascade*, not *Bauman v. Complita*, aligns with the Washington and majority rule.

In *Chau v. City of Seattle*, 60 Wn. App. 115 (1991), the city of Seattle appealed the trial court's order for a trial anew following a mistrial. The order barred the city by collateral estoppel from relitigating damages assessed by the jury. Vouch Chau died when struck by a car while crossing a Seattle street in a marked cross walk. Chau's family sued the driver and the city of Seattle. The driver never appeared and the trial court entered a default judgment against him. During deliberations, the jury could not reach a verdict on liability against the city and announced they were deadlocked. The court, at the city's request, directed the jury to complete a special verdict form. Question 1 asked whether the city of Seattle was negligent. The jury stated that it could not answer that question. The second question, whether negligence of the city was a proximate cause of the accident, was left unanswered. Questions 3 and 4 asked for the damages sustained by the decedent's husband and children. The jury answered both questions, determining the total damages to be $343,500. The trial court entered judgment against the driver for

this sum and an order for a new trial on the claim against Seattle that precluded the city from challenging the amount of the verdict.

On review, in *Chau v. City of Seattle*, this court wrote that the trial court possessed discretion to limit the new trial to the issue of liability alone as long as such a limitation did not work an injustice to either party. The city did not demonstrate any unfairness. It did not argue the verdict was excessive. The city suggested that the jury might assess less damages if the driver was no longer a defendant. The court responded that such argument assumed that the jury violated its oath and no evidence showed a violation. The court even suggested that collateral estoppel applied. The court noted a burden of the widow relitigating damages. The court did not emphasize that the city of Seattle had requested that the jury complete the special verdict.

In *Lindquist v. Dengel*, 20 Wn. App. 630, 581 P.2d 177 (1978), *aff'd*, 92 Wn.2d 257, 595 P.2d 934 (1979), a patient brought a malpractice action against a physician for negligence in diagnosis of tuberculosis. The jury found in favor of the the patient, but found the patient fifty percent at fault. The trial court reduced the award of damages from $5,000 to $2,500. On appeal, this court ruled that the trial court erred in giving a jury instruction that physicians who treat a patient during different and distinct time periods are liable to the patient only for their own negligence and not for the negligence of the other. The trial court also erred when refusing to give the patient's proposed instruction that the doctor could not avoid liability for aggravation of injuries to his

patient on the ground that it was caused by a negligent act of later treating physician. This court also reasoned that, when the actual award to the patient closely approximated the patient's special damages, the verdict showed a compromise on issues of liability as well as damages. Therefore, this court granted the patient a new trial not only on liability but damages.

In *Crawford v. Miller*, 18 Wn. App. 151 (1977), Kelly Ann Crawford suffered a fractured leg while riding her bicycle when a truck driven by Martin Miller struck the bicycle. In a special verdict, the jury awarded $6,000 to Kelley Ann and $1,500 to her father. It also found Kelley Ann 50 percent contributorily negligent, reducing the awards to $3,000 and $750. After trial, the trial court agreed that he committed instructional error in the relative duties of Crawford and Miller. The trial court ordered a new trial on both liability and damages. This court reversed the new trial on damages and remanded only for a new trial on liability and presumably an apportionment of fault if the second jury found both Crawford and Miller at fault. Crawford sought a new trial on damages because of the low amount. This court recognized the award to be low, but discerned that the award was within the evidence presented. Crawford had enjoyed the full opportunity to present evidence on the question of damages at the first trial. Justice did not require resubmission of the entire case to the jury when the award was not so low as to, by itself, justify a new trial. The jury had the opportunity to decide damages and liability separately.

The jury found the Swagers' damages to be $684,961.52. CP 1899, 1942. The Swagers do not contend that this award approximated Tamera Swager's special damages. Neither party contends that the award was excessive or inadequate. Neither party claims the award of damages constituted part of a compromise verdict. Neither party assigned error to any evidentiary rulings or jury instructions relating to damages.

The Swagers contend they should receive a new trial on damages because the jury should be allowed to consider deterrence when awarding compensatory damages. Nevertheless, in Washington, compensatory damages seek to redress a loss or injury, while punitive damages serve a deterrent function. *Bircumshaw v. State*, 194 Wn. App. 176, 206, 380 P.3d 524 (2016). Washington law disallows punitive damages unless expressly authorized by statute. *Broughton Lumber Co. v. BNSF Railway Co.*, 174 Wn.2d 619, 638 n.14, 278 P.3d 173 (2012). No case law supports the grant of a new trial on damages in order to allow the jury to deter a defendant from further negligence.

The last sentence of RCW 4.22.060(2) declares:

> However, the claim of the releasing person against other persons is reduced by the amount paid pursuant to the agreement unless the amount paid was unreasonable at the time of the agreement in which case the claim shall be reduced by an amount determined by the court to be reasonable.

Both parties are bound by the prior jury award of $684,961.52 in damages. As a result of RCW 4.22.060 and the payment of $207,289.36 in the aggregate by CCM Holdings and Value Village, Inland Lawn receives a credit for this sum in the event of any judgment

against it. Therefore, for any judgment to be entered against Inland Lawn, the jury must allocate to Inland Lawn, CCM Holdings, and Value Village in the aggregate fault of at least thirty percent. Otherwise, the judgment against Inland Lawn will not exceed $207,289.36.

## CONCLUSION

We remand to the superior court for a new trial, consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Siddoway, J.

_____
Pennell, J.